Filed 9/22/14  In re Le.B. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re LE.B., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D065371 |
| Plaintiff and Respondent, | (Super. Ct. No. J518352) |
| v. | |
| L.B. et al., | |
| Defendants and Appellants. | |

APPEALS from orders of the Superior Court of San Diego County, Kimberlee A. Lagotta, Judge.  Affirmed.

Paul A. Swiller, under appointment by the Court of Appeal, for Defendant and Appellant L.B.

Christopher Blake, under appointment by the Court of Appeal, for Defendant and Appellant Tamika B.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Carra L. Rhamy, Deputy County Counsel, for Plaintiff and Respondent.

L.B. and Tamika B. appeal the juvenile court's orders terminating their parental rights to their minor son Le.B. L.B. contends the court erred by finding the beneficial parent-child relationship exception did not apply to preclude terminating his parental rights. Additionally, L.B. and Tamika contend the court erred by failing to provide notice of the proceedings to the Bureau of Indian Affairs (BIA). We affirm the orders.

FACTUAL AND PROCEDURAL BACKGROUND

In February 2012, L.B. was stopped crossing into the United States from Mexico at the border with two-year-old Le.B. in the car. L.B. was arrested when agents found more than 28 pounds of methamphetamine in his car with an estimated street value of almost $400,000. As a result, Le.B. was taken into protective custody by the San Diego County Health and Human Services Agency (Agency). After L.B.'s arrest, a border patrol agent contacted Tamika, who was living in Washington State at the time, and Tamika immediately drove to San Diego.

When Tamika arrived she was interviewed by an Agency social worker. Tamika reported she and L.B. were married, but L.B. had been living in Long Beach, California, with Le.B. for the past few months. Tamika told the social worker she had been abused by L.B. in the presence of Le.B. She also reported she suffered from significant mental illness, but was not currently under the care of a psychiatrist or therapist. Tamika said she knew L.B. was traveling across the border frequently with Le.B., but denied any awareness of illegal activity and saw no risk to Le.B. from L.B.'s conduct. L.B. was also

2

interviewed by the Agency's social worker. He claimed he did not know drugs were in his car when he was arrested, but admitted to a lengthy criminal history that included arrests for attempted murder and kidnapping.

The Agency determined Tamika could not safely care for Le.B. and filed a petition in the juvenile court under Welfare and Institutions Code section 300, subdivision (b)[1] alleging Le.B. was at substantial risk of harm. The juvenile court sustained the allegations of the petition at the detention hearing and at the subsequent contested disposition hearing, declared Le.B. a dependant, removed him from parental custody and ordered reunification services for both parents. The court ordered Le.B. placed in a confidential licensed foster home.

In their initial interviews with the Agency's social worker, both parents denied any Native American heritage. A few weeks later, however, L.B. reported a family connection to the Blackfoot Tribe. The juvenile court set a special hearing to address the potential application of the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.). In response to L.B.'s statement, the Agency's ICWA specialist conducted interviews with L.B.'s mother and her cousin. Neither woman knew of any family member who was an enrolled member of a Native American tribe or that lived on a reservation. No one in the family ever received benefits from a tribe, spoke a native tribal language or participated in tribal political activities. L.B.'s mother stated that she may have been to a pow wow in Chicago when she was nine, but had not participated in any tribal cultural or religious

---

[1]     All statutory references are to the Welfare and Institutions Code.

3

activities since. Based on the two interviews, the ICWA specialist concluded L.B. had no other family members who could provide information about possible Native American heritage. The Agency submitted the findings of the ICWA specialist to the court and, based on those findings, the court concluded at the special hearing that ICWA was not applicable.

At the time of the six-month review hearing, Tamika was still living in Washington and had only recently begun engaging in the services required by her case plan. L.B. remained in federal custody and was awaiting trial. The Agency reported Le.B. was happy with his foster family. Le.B. had regular visitation with L.B. in prison and occasionally spoke with his parents on the phone.[2] The Agency reported L.B. was appropriate and attentive to Le.B. during visits. At the six-month review hearing, the court continued reunification services for both parents.

By the time of the 12-month review hearing, L.B. had been convicted of drug trafficking and was awaiting sentencing. L.B. continued regular visits with Le.B. and the interactions continued to be positive. On at least one occasion, Le.B. was upset when the visit ended. Tamika moved back to San Diego and began visitation with Le.B. She also enrolled in services required by her case plan, including individual therapy and domestic violence classes. Before the 12-month review hearing, the Agency received the results of Tamika's psychological examination, which it had previously requested. The report indicated Tamika suffered from posttraumatic stress and borderline personality disorders.

---

[2]     Le.B. was placed with a foster family whose primary language was Spanish. Both parents complained phone contact was difficult because of the language barrier.

In its report for the hearing, the Agency recommended services be terminated for both parents. In support of this recommendation, the Agency relied on the reporting psychologist's statement that it would take five years of intensive therapy for Tamika to improve her mental health enough to care for Le.B. The parents contested the Agency's recommendations, arguing reasonable services had not been provided. At the conclusion of the contested hearing, the juvenile court found the Agency had provided reasonable services to both parents and it was not likely Le.B. would be returned to their care by 18 months. The court terminated services and set the permanency planning hearing.

Le.B. was placed in a new foster home with a family that wanted to adopt him if L.B. and Tamika's parental rights were terminated. Le.B. was thriving in his new home and his foster parents saw improvements in behavioral issues. By the time of the section 366.26 hearing, L.B. had been sentenced to nine years in federal prison and transferred to an Oregon facility. He continued to have telephonic visitation with Le.B. after his transfer. However, Le.B.'s foster mother had difficulty persuading Le.B., who was now four and a half years old, to talk to L.B.

At the contested section 366.26 hearing, the court heard the testimony of both parents, the prospective adoptive mother, the family's social worker and an Agency worker that transported Le.B. to and supervised visits with L.B. in prison. After considering the evidence and arguments of counsel, the juvenile court found Le.B. was generally and specifically adoptable and that neither parent had shown the beneficial parental or sibling relationship exception to adoption was applicable. The court terminated parental rights and referred Le.B. for adoptive placement.

5

DISCUSSION

I

Both parents contend the juvenile court erred by not complying with the notice requirements of ICWA. They argue notice of the proceedings should have been sent to the Blackfoot Tribe and the BIA.

A

"ICWA protects the interests of Indian children and promotes the stability and security of Indian tribes and families by establishing certain minimum federal standards in juvenile dependency cases." (*In re Shane G.* (2008) 166 Cal.App.4th 1532, 1538 (*Shane G.*).) An Indian child is defined as any unmarried person who is under age 18 and is either (a) a member of an Indian tribe, or (b) eligible for membership in an Indian tribe and the biological child of a member of an Indian tribe. (25 U.S.C. § 1903(4).)

ICWA imposes a duty to give the child's tribe notice of the pending proceedings and provides the tribe a right to intervene "[w]hen a court 'knows or has reason to know that an Indian child is involved' in a juvenile dependency proceeding." (*Shane G., supra*, 166 Cal.App.4th at p. 1538; § 224.2, subd. (a).) "Alternatively, if there is insufficient reason to believe a child is an Indian child, notice need not be given." (*Shane G.*, at p. 1538.) Notice requirements are meant to ensure that the child's Indian tribe will have the opportunity to intervene and assert its rights in the proceedings. (*In re Kahlen W.* (1991) 233 Cal.App.3d 1414, 1421.)

Section 224.3, subdivision (a) imposes an "affirmative and continuing duty" on the court and the Agency "to inquire whether a child for whom a petition . . . is to be, or has

been, filed is or may be an Indian child in all dependency proceedings . . . ." Subdivision (b) states circumstances that may provide reason to know the child is a Native American child include the following: "(1) A person having an interest in the child . . . provides information suggesting the child is a member of a tribe or eligible for membership in a tribe or one or more of the child's biological parents, grandparents, or great-grandparents are or were a member of a tribe. (2) The residence or domicile of the child, the child's parents, or Indian custodian is in a predominantly Indian community. (3) The child or the child's family has received services or benefits from a tribe or services that are available to Indians from tribes or the federal government, such as the Indian Health Service." (See also Cal. Rules of Court, rule 5.481(a)(5).)

If these or other circumstances indicate a child may be a Native American child, the social worker must further inquire regarding the child's status. Further inquiry includes interviewing the parents, extended family members or any other person who can reasonably be expected to have information concerning the child's membership status or eligibility. (§ 224.3, subd. (c).) If the inquiry leads the social worker or the court to know or have reason to know a Native American child is involved, the social worker must provide notice to the tribe and the BIA. (*Id.*, subd. (d); *Shane G., supra*, 166 Cal.App.4th at pp. 1538-1539.) More than a bare suggestion of Native American ancestry is needed before notice is required. (*In re Jeremiah G.* (2009) 172 Cal.App.4th 1514, 1520.)

B

Proper inquiry was conducted to determine whether Le.B. was a Native American child within the meaning of ICWA. Social workers asked both parents whether they had possible Indian heritage. After initially denying Native American heritage, L.B. reported his family had "a connection with [the] Blackfoot Tribe." The Agency's ICWA specialist then conducted interviews of L.B.'s mother and her cousin concerning the family's Native American heritage. According to these relatives, no family members had ever been registered or eligible for enrollment with a tribe. No family members spoke a Native American language, attended a Native American school, received services from a tribe, or lived on a reservation. Aside from his mother's uncertain recollection of attending a pow wow, no family member participated in Native American cultural or political affairs.[3]

The interviews conducted by the Agency's ICWA specialist fulfilled the Agency's and court's duty to inquire into the possibility Le.B. was a Native American child. (§ 224.3, subd. (a).) The specialist's inquiry did not uncover any reason to believe Le.B. was a Native American child. (§ 224.3, subd. (b).) On this record, the court was not required to provide ICWA notice.[4] (§ 224.3, subd. (d); *Shane G., supra*, 166

---

[3] Tamika argues the Agency should have also interviewed L.B.'s paternal relatives. Nothing in the record, however, suggests Native American heritage on L.B.'s father's side and the Agency's ICWA specialist determined L.B. had no other relatives with information about the family's possible Native American heritage.

[4] Tamika also complains (1) that the form used in juvenile dependency proceedings to document a claim of Native American heritage was not obtained from L.B. and (2) that

8

Cal.App.4th at p. 1539 [an attenuated, speculative or vague claim of Indian heritage is insufficient to trigger notice requirements under ICWA].) "Where, as here, the record is devoid of any evidence a child is an Indian child, reversing the judgment terminating parental rights for the sole purpose of sending notice to the tribe would serve only to delay permanency for a child . . . rather than further the important goals of and ensure the procedural safeguards intended by ICWA." (*Shane G.,* at p. 1539.)

## II

L.B. argues insufficient evidence supported the juvenile court's finding that the parent-child relationship exception to adoption did not apply. L.B. asserts he maintained regular visitation and contact with Le.B. and had a beneficial parental relationship that outweighed the benefits of adoption.

## A

After reunification services are terminated, the focus of a dependency proceeding shifts from preserving the family to promoting the best interests of the child, including the child's interest in a stable, permanent placement that allows the caregiver to make a full emotional commitment to the child. (*In re Fernando M.* (2006) 138 Cal.App.4th 529, 534.) At the selection and implementation hearing, the court has three options:

---

she and L.B. were not present at the special hearing set to address the application of ICWA. In light of the Agency's investigation, the lack of the form is immaterial. With respect to the parents' presence at the hearing, the record indicates counsel for both parents were present and did not raise any objection to the court's finding that ICWA was not applicable.

9

(1) terminate parental rights and order adoption as the permanent plan; (2) appoint a legal guardian for the child; or (3) order the child placed in long-term foster care. (*Ibid.*)

"Adoption, where possible, is the permanent plan preferred by the Legislature." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573.) If the court finds a child cannot be returned to his or her parent and is likely to be adopted if parental rights are terminated, it must select adoption as the permanent plan unless it finds termination of parental rights would be detrimental to the child under one of the specified statutory exceptions. (§ 366.26, subd. (c)(1)(A) & (B)(i)-(vi); *In re Erik P.* (2002) 104 Cal.App.4th 395, 401.) "The parent has the burden of establishing the existence of any circumstance that constitutes an exception to termination of parental rights." (*In re T.S.* (2009) 175 Cal.App.4th 1031, 1039.) Because a selection and implementation hearing occurs "after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.)

Section 366.26, subdivision (c)(1)(B)(i) provides an exception to the adoption preference if termination of parental rights would be detrimental to the child because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." Courts have interpreted the phrase " 'benefit from continuing the . . . relationship' " to refer to a parent-child relationship that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the

court balances the strength and quality of the natural parent[-]child relationship in a tenuous placement against the security and the sense of belonging a new family would confer.  If severing the natural parent[-]child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated."  (*In re Autumn H., supra*, 27 Cal.App.4th at p. 575; accord, *In re Jason J.* (2009) 175 Cal.App.4th 922, 936.)

To meet the burden of proof for this statutory exception, the parent must show more than frequent and loving contact, an emotional bond with the child or pleasant visits.  (*In re Derek W.* (1999) 73 Cal.App.4th 823, 826-827.)  The parent must show he or she occupies a parental role in the child's life, resulting in a significant, positive emotional attachment from child to parent that if severed would result in harm to the child.  (*Id.* at p. 827; *In re Elizabeth M.* (1997) 52 Cal.App.4th 318, 324.)  The exception does not require proof the child has a " 'primary attachment' " to the parent or the parent has maintained day-to-day contact with the child.  (*In re S.B.* (2008) 164 Cal.App.4th 289, 299; *In re Brandon C.* (1999) 71 Cal.App.4th 1530, 1534-1538; *In re Casey D.* (1999) 70 Cal.App.4th 38, 51.)

We review an order terminating parental rights for substantial evidence.  (*In re Autumn H., supra*, 27 Cal.App.4th at p. 576.)  If, on the entire record, there is substantial evidence to support the findings of the juvenile court, we uphold those findings.  We do not consider the credibility of witnesses, attempt to resolve conflicts in the evidence or weigh the evidence.  Instead, we draw all reasonable inferences in support of the

11

findings, view the record favorably to the juvenile court's order and affirm the order even if there is substantial evidence supporting a contrary finding. (*In re Casey D., supra*, 70 Cal.App.4th at pp. 52-53; *In re Baby Boy L.* (1994) 24 Cal.App.4th 596, 610.) The parent has the burden of showing there is no evidence of a sufficiently substantial nature to support the finding or order. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

B

L.B. contends his rights should not have been terminated because he maintained regular visitation and Le.B. would benefit from a continued relationship with him. The juvenile court's finding that the potential harm to Le.B. of terminating parental rights did not outweigh the potential benefits of adoption, however, was supported by substantial evidence.

L.B. argues he did everything possible to maintain his parental role in Le.B.'s life given his incarceration. Indeed, the juvenile court found L.B. maintained regular visitation with Le.B. until he was convicted and transferred to a prison outside of San Diego, and that L.B. loved and cared for Le.B. These facts, however, do not show L.B.'s bond with Le.B. was so significant that it outweighed the benefits to Le.B. of adoption. By the time of the permanency planning hearing, Le.B. was in his third foster home and had been out of his parents care for close to two years. As discussed, Le.B.'s visits with L.B. were generally positive and Le.B. enjoyed his time with L.B. As L.B. points out, at the beginning of L.B.'s incarceration, there was at least one visit when Le.B. had difficulty separating from his father. By the time of the section 366.26 hearing, however, Le.B. did not ask to see L.B. between visits and had to be coaxed to speak with L.B. on

12

the phone. There was no evidence Le.B. was adversely affected by L.B.'s absence from his daily life.

"A biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466.) Although L.B. cared about and expressed his love for Le.B., this was not enough to show he had a " 'significant, positive, emotional attachment' " such that terminating the parent-child relationship would greatly harm Le.B. (*In re Jason J., supra*, 175 Cal.App.4th at pp. 936, 937-938; *In re Autumn H., supra*, 27 Cal.App.4th at p. 575.)

Further, the evidence supported the court's finding that the benefits of adoption outweighed the benefits of maintaining the parent-child relationship. Le.B. was living in the home of caregivers who were committed to adopting him. He looked to these caregivers to meet his physical, emotional and psychological needs. In the social worker's opinion, the minor's need for stability, safety and permanency outweighed any possible detriment that would be caused by severing the parental relationship. The court was required to, and did, weigh the strength and quality of the parent-child relationship, and the detriment involved in terminating it, against the potential benefit of an adoptive home. We do not reweigh the evidence or substitute our judgment for that of the juvenile court. (*In re Casey D., supra*, 70 Cal.App.4th at pp. 52-53.) Substantial evidence supports the court's finding the beneficial parent-child relationship exception did not apply to preclude terminating parental rights.

13

DISPOSITION

The orders are affirmed.

McCONNELL, P. J.

WE CONCUR:

HUFFMAN, J.

NARES, J.

14