84 Cal.Rptr.2d 505 (1999)
71 Cal.App.4th 1530
In re BRANDON C. et al., Persons Coming Under the Juvenile Court Law.
Los Angeles County Department of Children and Family Services, Plaintiff and Appellant,
v.
Roberta B. et al., Defendants and Respondents.
No. B124552.
Court of Appeal, Second District, Division Four.
April 30, 1999.
Rehearing Denied May 25, 1999.
Lloyd W. Pellman, County Counsel, Lois D. Timnick, Monterey Park, and Stephanie Jo Farrell, Auxiliary Legal Services, Inc., for Plaintiff and Appellant.
William M. Roth, under appointment by the Court of Appeal, for Defendant and Respondent Roberta B.
Melissa A. Chaitin, under appointment by the Court of Appeal, for Defendant and Respondent Steven C.
EPSTEIN, Acting P.J.
In this appeal, the Department of Children and Family Services (DCFS) challenges the *506 juvenile court order selecting guardianship as the permanent plan for Brandon and Rangey C. We find substantial evidence to support the order and affirm.

FACTUAL AND PROCEDURAL SUMMARY
Brandon and Rangey C, twin boys born June 14, 1994, were detained in October 1994 after DCFS learned that they had been victims of domestic violence. They were placed in the home of their paternal grandmother, Mary S., in December 1994, and have been in her care since that time. The boys were declared dependent children pursuant to Welfare and Institutions Code section 300[1] in February 1995, based on sustained allegations that Rangey had suffered injuries while in his parents' care, and that their mother had a history of substance abuse.
Reunification services were ordered and provided, but as of May 28, 1996, the date of the section 366.22 hearing, neither parent had completed the court-ordered treatment. The court found reasonable reunification services had been offered, but that returning the boys to their parents' care would create a substantial risk of detriment to them. Reunification services were terminated and the matter set for a selection and implementation hearing pursuant to section 366.26.
In May 1997, DCFS informed the court that it was not in a hurry to hold the section 366.26 hearing because the mother had been talking with the social worker and appeared to be making progress. The matter was continued to September 1997, then put over several more times because DCFS had not obtained a medical report regarding the health of the paternal grandmother, who was the prospective adoptive parent.
In January 1998, mother filed a section 388 petition requesting that the boys be returned to her care. The court denied a section 388 hearing because the petition was not verified.
After a series of continuances, the section 366.26 hearing finally was held on June 2, 1998. DCFS recommended adoption as the permanent plan, and identified the paternal grandmother as the prospective adoptive parent. Mother objected to that plan, arguing that the grandmother was 69 years of age and had medical problems.
The paternal grandmother testified that she had angina and high blood pressure, which was controlled with medication. She also took thyroid medication. She preferred to adopt the boys, but was willing to be their legal guardian, if that is what the court ordered. The grandmother testified that mother had visited the boys regularly throughout the years, that the children look forward to the mother's visit, have a good relationship with mother, refer to her as "Mommy," and seem to love her. The grandmother did not think it would be in the boys' best interest to terminate their relationship with the mother and father, explaining that "they still have a good relationship with their parents, and I think that should continue."
Mother testified that she had visited the boys every week for the past three years, except when she was out of state. The boys are happy and affectionate to her when she visits, and she feels she has a close bond with them.
Father joined in mother's opposition to adoption. Counsel for the children submitted on the DCFS report recommending adoption.
The court found, pursuant to section 366.26, subdivision (c)(1)(A), that it would be in the children's best interest "to maintain the relationship between the minors and their mother. Perhaps the minors and their father as well, but certainly as to the minors and the mother, [¶] The court finds that the mother has ... maintained regular visitation. Perhaps father has maintained regular visitation as well. Although I'm more considering mother and that the minors would benefit from continuing their relationship with their mother." The court ordered legal guardianship for Brandon and Rangey. The paternal grandmother has since been appointed guardian of the children. DCFS appeals from this order.

*507 DISCUSSION
Appellant claims the evidence is insufficient to support the court's finding that termination of parental rights would be detrimental to the children. We do not agree.
At the selection and implementation hearing held pursuant to section 366.26, the court must choose a permanent plan for the dependent child. The court may terminate parental rights and order adoption; identify adoption as the permanent goal and order efforts made to locate an adoptive family within 90 days without terminating parental rights; order legal guardianship without terminating parental rights; or order long-term foster care without terminating parental rights. (§ 366.26, subd. (b).)
Under subdivision (c)(1),[2] "[t]he court shall terminate parental rights only if it determines by clear and convincing evidence that it is likely that the minor will be adopted...." If the court finds the child adoptable, it must terminate parental rights unless it finds that termination would be detrimental to the child due to one of four circumstances. The one pertinent to our case is section 366.26, subdivision (c)(1)(A): "The parents or guardians have maintained regular visitation and contact with the minor and the minor would benefit from continuing the relationship."
The statute does not define the type of parent-child relationship which will trigger the application of this exception. The court in In re Autumn H. (1994) 27 Cal.App.4th 567, 32 Cal.Rptr.2d 535 interpreted the exception to mean that "the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (In re Autumn H., supra, 27 Cal.App.4th at p. 575, 32 Cal.Rptr.2d 535.)
Courts have required more than just "frequent and loving contact" to establish the requisite benefit for this exception. (See In re Beatrice M. (1994) 29 Cal.App.4th 1411, 1418-1419, 35 Cal.Rptr.2d 162.) "Interaction between natural parent and child will always confer some incidental benefit to the child.... The relationship arises from day-to-day interaction, companionship and shared experiences. [Citation.] The exception applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent." (In re Autumn H., supra, 27 Cal.App.4th at p. 575, 32 Cal. Rptr.2d 535.)
The court made that finding in our case, and we find substantial evidence to support that determination. As of May 1996, visitation for both parents was limited to three hours, twice each week, to be monitored by the paternal grandmother. The visits took place separately, so that mother and father, who were no longer together, did not see each other. The September 1996 report showed consistent visitation by both parents, to the extent permitted by the order. According to the paternal grandmother, "the parents usually talk to and play with the children during the visitations. They also help in feeding them and caring for them, by changing diapers, picking up toys, and keeping them safe." Rangey, the better developed of the twins, "seems to understand the concept of `momma' and `daddy' and likes to be with them." The child tended to cry for long periods and would resist going to bed after visitations with mother.
As of February 1997, the boys had been transferred to the adoptions division for adoptive planning. The DCFS progress report dated February 6, 1997 recommended that "the time has come to locate an adoptive family and begin to disengage these minors *508 from their parents. As a result, visitation between the parents and the minors should be limited to monitored visits, not to exceed one hour per month." Despite the recommendation, the previous visitation order remained in effect.
The report for the May 1997 hearing noted that the parents "have maintained regular contact, through weekly monitored visits on different days of the week with the children." DCFS again recommended limiting visitation to one hour per month, but the court continued the prior visitation order in effect. It was at this May 1997 hearing that the social worker informed the court that mother "has been talking with me and she said there's some things she is trying to do to get her life together. It may make a difference." In light of this, the court continued the section 366.26 hearing to September 1997.
The report for the September 1997 hearing indicated that both parents had maintained regular contact with the children. Mother's visitation was described as "sporadic" in that she had "failed to have these visitations as scheduled, and usually calls to reschedule them to a different day, different time, and/or to cancel." Once again, DCFS recommended limiting visitation to one hour per month. At the hearing, the court ordered the social worker to meet with mother to work out a visitation schedule, but made no other change in the visitation order. Father agreed to the recommendation of adoption.
The December 1997 report indicated that mother had remained in contact with the social worker on a weekly basis since the September hearing, and had visited the children almost weekly since that date. Mother was participating in her drug rehabilitation program, maintained a stable residence for the prior six months, and had been employed as a receptionist for a law office since May 1997. Despite mother's progress, DCFS recommended termination of parental rights, and again asked that visitation be limited to one hour per month. The matter was continued, with no change in the visitation order.
The March 1998 report showed that mother had visited the children weekly since the September 1997 hearing, that she had completed her drug rehabilitation program, that her random drug tests had been negative, and that her housing and employment had been stable for many months. The recommendations remained the same: termination of parental rights, and limitation of visits to one hour per month. The matter was continued, with no change in the visitation order.
The first comment in over two years on the quality of mother's interaction with the children, rather than just the frequency of her visits, was in mother's section 388 petition seeking a 60-day visit with her sons. Attachment 4 to the June 1, 1998 petition states: "Mother, Roberta B[.], has made substantial progress in her treatment programs and has a suitable residence for the children. Moreover, mother visits the children on a weekly basis and a close bond exists between mother and children."
The DCFS report for the June 2, 1998 hearing once again contains no description of the quality of mother's interaction with the children, stating only that "Mother visits with minors every week for 2 hours except when she was out of town for family business the weekend of April 3-4, 1998." The social worker stated: "CSW is of the opinion that continued contact/visitation between Rangey C[.] and Brandon C[.] and their biological parents is unnecessary, confusing to the boys, contrary to the concept of adoption and therefore not in the boys' best interests. Thus, CSW is of the opinion that all visitation between the children and their biological parents should be terminated forthwith." The DCFS recommendation in the report was that all visits between the children and the biological parents be terminated forthwith.
At the section 366.26 hearing, finally conducted on June 2, 1998, the paternal grandmother was questioned about mother's visits with the children. The grandmother testified that mother had been "pretty regular" in her visits with the boys throughout the years, visiting once a week for approximately two hours. Mother indicated she would like to visit them more often, but the social worker had told the grandmother that the court order was for once a week. The children look forward to the mother's visit, they have a good relationship with mother and seem to *509 love her. They refer to mother as "Mommy."
Asked if she thought it would be in the boys' best interest to terminate their relationship with the mother, the grandmother responded, "Like I said before, I said complete cut off, I don't think, no, because they still have a good relationship with their parents, and I think that should continue." The grandmother was asked how the boys would be affected if she became the boys' adopted mother, and legally the mother became a stranger to them. She replied, "I really don't think she could ever become a stranger to them because they've been close, and they know Robin and Robin and Mommy." She expected the children would continue to refer to the mother as "Mommy" and "this would not bother" her.
Asked about her preference between adoption and guardianship, the grandmother explained that she initially thought she was too old to adopt the children, but she was told that she was not. She stated she would prefer adoption. "I can't tell you exactly why. I just would. I feel the boys are mine even though I know they are only my grandchildren, but I will go along with what the court says. If they want me to have guardianship, that will be fine with me even though I prefer legal adoption."
Mother testified that she had faithfully visited the boys every week for the past three years, except when she was out of state. When mother visits them, they are happy, give her hugs and kisses, and say "mommy, mommy." She feels there is a close bond between her and the boys. She has a cordial relationship with the paternal grandmother, but is afraid that if they are adopted, she will only be able to see them once in a while, at the paternal grandmother's convenience. She has wanted to see the children more often, or wanted the visits to last longer, but the grandmother has "pretty much" told her that she had to leave at a certain time and could not extend the visits.
It is undisputed that mother visited the boys consistently for the entire lengthy period of this dependency case, to the extent permitted by the court's orders. The trial court obviously credited the testimony from both mother and grandmother that there was a close bond between the mother and the boys, and that a continuation of contact would be beneficial to the children. DCFS did not present any evidence to the contrary. What it presented, in two years of reports, was a continuing recommendation to limit mother's visitation, without any consideration of the benefits those visits might have for the children. Substantial evidence supports the trial court's conclusion that mother had maintained regular visitation and that the children would benefit from continuing the relationship.
We reject DCFS's argument that the court's order was unsupported because mother did not present evidence that "during her weekly monitored visits with the children she regularly provided the children with comfort, nourishment or physical care." The benefit of continued contact between mother and children must be considered in the context of the very limited visitation mother was permitted to have. In this case, mother was not the boys' primary caretaker, and a quantitative measurement of the specific amount of "comfort, nourishment or physical care" she provided during her weekly visits is not necessary. Moreover, it is DCFS which failed to provide information to the court about the quality of the visits during the years preceding the section 366.26 hearing. Its reports consistently described the regularity of the visits, with no evaluation of their success. Under the circumstances of this case, we find the evidence of benefit sufficient to support the court's decision to order guardianship.
We are not troubled by the court's reference to mother being able to provide a "safety valve in the future, if need be." The court's attention was first focused, properly, on the existence of a relationship between parent and children, and the benefit to the children from continuing that relationship. The fact that the court also felt a good relationship between mother and children could provide additional security for the children, "if need be," does not undermine the evidentiary support for the court's finding under section 366.26, subdivision (c)(1)(A).

*510 DISPOSITION
The order is affirmed.
HASTINGS, J., and CURRY, J., concur.
NOTES
[1] All statutory references are to this code unless otherwise noted.
[2] We quote this section as in effect at the time of the hearing. It was amended, operative January 1, 1999.