Filed 7/10/15  In re D.D. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re D.D. et al., Persons Coming Under the Juvenile Court Law. | |
| | D067618 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. SJ11900E-F) |
| v. | |
| DIANA A. et al., | |
| Defendants and Appellants. | |

APPEALS from orders of the Superior Court of San Diego County, Laura J. Birkmeyer, Judge.  Affirmed.

Neil R. Trop, under appointment by the Court of Appeal, for Defendant and Appellant Diana A.

Julie E. Braden, under appointment by the Court of Appeal, for Defendant and Appellant Cameron D.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Patrice Plattner-Grainger, Deputy County Counsel, for Plaintiff and Respondent.

Diana A. and Cameron D. appeal juvenile court orders terminating their parental rights to their minor twins, D.D. and U.D., under Welfare and Institutions Code section 366.26.[1]  Diana and Cameron contend the court erred by finding the beneficial parent-child relationship exception did not apply to preclude termination of their parental rights. We affirm the orders.

## FACTUAL AND PROCEDURAL BACKGROUND

The record in the case reveals a long history of involvement by the San Diego County Health and Human Services Agency (Agency) with Diana and Cameron.  Diana failed to reunite with her four older children and her parental rights to each of these minors were terminated between 2004 and 2013.[2]  Cameron also failed to reunite with

---

[1]    All further statutory references are to the Welfare and Institutions Code.

[2]    Diana's oldest child, Dorian A., was born in 2004 and tested positive for methamphetamine and marijuana at birth.  Diana's parental rights to Dorian were terminated in 2009.  Her second child, Davian A., was born in 2007 and also tested positive for methamphetamine at birth.  Diana's parental rights to Davian were terminated in 2008, just before her third child, D.J., was born.  D.J. was taken into protective custody as a result of Diana's history of drug abuse and failure to reunify with her older children.  Diana did reunify with D.A. at the 18-month hearing, but shortly thereafter relapsed into drug abuse and her parental rights to D.J. were terminated in 2010.  Diana's fourth child, Dem. D., who shares the same father as D.D. and U.D., was born in 2012.  Dem. D. was placed with his paternal grandmother, Beverly J., and Diana's and Cameron's parental rights to this child were terminated during the pendency of this proceeding.

2

his two other children.[3]  This case involves twins, D.D. and U.D., born in January 2013. Shortly after the twins' birth, the Agency opened a voluntary case for Diana requiring her to participate in various services including treatment for drug abuse.  At the time, Diana and the twins lived with family friends Brenda and Alberto T., who helped care for the infants.  In August 2013, the Agency closed the voluntary case because Diana was not participating in required services.

In October 2013, Diana tested positive for methamphetamines.  Diana also reported to the Agency she was planning to move out of the relative stability of Brenda and Alberto's home and into a shelter with the minors because of conflict with Brenda, Alberto and their adult daughter.  The daughter had recently confronted Diana about her drug use and failure to care for the twins.  Diana also refused to consent to medical treatment for U.D. when Brenda brought U.D. to the hospital with an ear infection.  As a result, the Agency filed petitions in the juvenile court under section 300, subdivision (b) on behalf of D.D. and U.D.  The petitions alleged the twins suffered harm or were at substantial risk of harm because of the inability of Diana to provide adequate care for them due to her use of methamphetamines.  The petition further alleged Diana failed to reunify with her older children as a result of her drug use and that Diana "leaves the child[ren] with other people . . . and does not come home for a few days at a time . . . ."

---

3    In addition to three children he fathered with Diana, Cameron has another child, Jaylen D., also under the jurisdiction of the juvenile court.  Cameron told the Agency's social worker he was not provided reunification services with respect to this child because he was incarcerated at the time of the proceedings.

The petitions also alleged Cameron was incarcerated and, therefore, not able to care for or protect D.D. and U.D.[4]

At the detention hearing, the juvenile court found the Agency had made a prima facie showing the minors were children described by section 300, subdivision (b) and that their initial removal from Diana's care was appropriate. The court ordered D.D. and U.D. detained at Polinsky Children's Center, rejecting Diana's request that the minors remain in her care. The court ordered liberal supervised visits for both parents. Shortly after the detention hearing, the twins were placed with their paternal grandmother, Beverly J., who also had custody of Dem. D. and Jaylen. On January 17, 2014, at the end of the contested jurisdiction and disposition hearing the juvenile court sustained the allegations of the Agency's petitions, declared the minors dependents of the court and ordered that they remain in Beverly's care.[5] The court ordered reunification services for Diana, but denied reunification services for Cameron under section 361.5, subdivision (e)(1), finding services would be detrimental to the minors. The court set the six-month review hearing for July 2014.

Before the review hearing, on March 18, 2014, counsel for the minors filed a petition for modification under section 388 requesting the termination of services for Diana and asking the court to set a section 366.26 hearing. The petition was based on

---

[4] Cameron was incarcerated in March 2013 for possession of a controlled substance for sell.

[5] The juvenile court's minute orders from this hearing are inaccurately labeled "Contested W&I 366.26 Hearing." (Capitalization omitted.)

4

Diana's failure to engage in services, failure to remain in contact with her support system, several missed drug tests and a positive drug test for methamphetamine. The petition also alleged Diana was recently arrested following a physical altercation with another woman. Diana contested the section 388 petition. After a hearing on May 2, 2014, the juvenile court terminated services and scheduled a 366.26 hearing for August 26, 2014.[6]

Thereafter, a series of delays caused the 366.26 hearing to be rescheduled to February 2015. Specifically, Cameron was released from jail in September and, on October 24, 2014, he filed an unsuccessful section 388 petition seeking reunification services. At the hearing on Cameron's section 388 petition, Beverly told the social worker that she wanted to seek legal guardianship of the twins rather than adoption to give the parents a chance to turn their lives around, again temporarily delaying the 366.26 hearing. Shortly thereafter, however, Beverly recanted, explaining she had been pressured by Diana and her attorney, as well as Cameron, to say she only wanted a guardianship. Beverly reaffirmed her commitment to adopting U.D. and D.D., which she believed was in their best interests.

During this period of delay, Diana visited the twins regularly, but continued to struggle with drug abuse and maintaining stable housing.[7] In November she was asked

---

[6] Diana filed her own section 388 petition within days of the court's order terminating services. The court denied the petition based on lack of changed circumstances.

[7] Despite these challenges, in October, Diana filed another unsuccessful section 388 petition seeking reinstatement of services and requesting the twins be placed with Brenda and Alberto.

to leave Brenda and Alberto's home.  Brenda reported Diana was still involved with Cameron and that she was more interested in spending time with him than with the minors.  Brenda also believed Diana was again regularly using drugs.  In December, Beverly reported that Jaylen's mother, Jessica, had seen Cameron and Diana outside of a known drug location.  Jessica confirmed this information and also reported Cameron had physically abused her and threatened to kill Beverly and kidnap the children.  As a result of Jessica's allegations, the Agency filed a section 388 petition seeking to suspend Cameron's visitation and to limit Diana to one visit per week at the Agency's office where additional security could be provided.  The juvenile court granted the petition and entered a temporary restraining order against Cameron to protect Beverly and the minors.

The Agency's final supplemental report for the February 9, 2015, 366.26 hearing stated that Diana's employer reported she had been absent from work for a week. Beverly reported that neither parent had called the minors on their birthday.  Brenda reported she had picked up Diana from a hotel near the Mexican border where Cameron had left her and that Diana had lost a lot of weight and her arms were covered with bruises.

In each of the Agency's six reports leading up to the 366.26 hearing, the social worker provided detailed descriptions of his observations of Diana's visits with the minors.  The social worker noted that Diana's visitation had been regular until September, but only sporadic thereafter.  The social worker stated the twins enjoyed visits with Diana, but he did not believe Diana had a parental bond with the minors.  In support of this assessment, the social worker pointed to the lack of emotional reaction by the minors

6

either when they greeted Diana or when Diana left their presence. The social worker also noted the twins sought out Beverly, not Diana, for their needs. He also reported Diana's attention to the minors often waned during visits.

At the 366.26 hearing held on February 9 and February 13, 2015, the juvenile court received the Agency's reports into evidence and heard the testimony of Diana, Cameron, Brenda, the paternal grandmother, and the family's social worker. At the conclusion of the hearing, the juvenile court found by clear and convincing evidence that the minors were likely to be adopted and that none of the statutory exceptions to the termination of parental rights applied. The court terminated parental rights and referred D.D. and U.D. for adoptive placement.

## DISCUSSION

Diana contends the juvenile court erred by finding the beneficial parent-child relationship exception to adoption did not apply. She asserts she maintained regular visitation and contact with the minors, had a substantial and positive emotional attachment with them and occupied a parental role in their lives. Diana further argues a permanent plan of guardianship, rather than adoption, was in the minors' best interests. Cameron joins in Diana's arguments, but does not contend his own relationship with the minors supports application of the beneficial parent-child relationship exception to adoption.

### A

After reunification services are terminated, the focus of a dependency proceeding shifts from preserving the family to promoting the best interests of the child, including

7

the child's interest in a stable, permanent placement that allows the caregiver to make a full emotional commitment to the child. (*In re Fernando M.* (2006) 138 Cal.App.4th 529, 534.) At the selection and implementation hearing, the court has three options: (1) terminate parental rights and order adoption as the permanent plan; (2) appoint a legal guardian for the child; or (3) order the child placed in long-term foster care. (*Ibid.*)

"Adoption, where possible, is the permanent plan preferred by the Legislature." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573 (*Autumn H.*).) If the court finds a child cannot be returned to his or her parent and is likely to be adopted if parental rights are terminated, it must select adoption as the permanent plan unless it finds termination of parental rights would be detrimental to the child under one of the specified statutory exceptions. (§ 366.26, subd. (c)(1)(A) & (B)(i)-(vi); *In re Erik P.* (2002) 104 Cal.App.4th 395, 401.) "The parent has the burden of establishing the existence of any circumstance that constitutes an exception to termination of parental rights." (*In re T.S.* (2009) 175 Cal.App.4th 1031, 1039.) Because a selection and implementation hearing occurs "after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.)

Section 366.26, subdivision (c)(1)(B)(i) provides an exception to the adoption preference if termination of parental rights would be detrimental to the child because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." Courts have interpreted the phrase

8

" 'benefit from continuing the . . . relationship' " to refer to a parent-child relationship that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent[-]child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent[-]child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575; accord, *In re Jason J.* (2009) 175 Cal.App.4th 922, 936 (*Jason J.*).)

To meet the burden of proof for this statutory exception, the parent must show more than frequent and loving contact, an emotional bond with the child or pleasant visits. (*In re Derek W.* (1999) 73 Cal.App.4th 823, 827.) The parent must show he or she occupies a parental role in the child's life, resulting in a significant, positive emotional attachment from child to parent that if severed would result in harm to the child. (*Ibid.*; *In re Elizabeth M.* (1997) 52 Cal.App.4th 318, 324.) The exception does not require proof that the child has a " 'primary attachment' " to the parent or that the parent has maintained day-to-day contact with the child. (*In re S.B.* (2008) 164 Cal.App.4th 289, 299; *In re Brandon C.* (1999) 71 Cal.App.4th 1530, 1534-1538; *In re Casey D.* (1999) 70 Cal.App.4th 38, 51 (*Casey D.*).)

We review an order terminating parental rights for substantial evidence. (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.) If, on the entire record, there is substantial evidence

9

to support the findings of the juvenile court, we uphold those findings. We do not consider the credibility of witnesses, attempt to resolve conflicts in the evidence or weigh the evidence. Instead, we draw all reasonable inferences in support of the findings, view the record favorably to the juvenile court's order and affirm the order even if there is substantial evidence supporting a contrary finding. (*Casey D.*, *supra*, 70 Cal.App.4th at pp. 52-53; *In re Baby Boy L.* (1994) 24 Cal.App.4th 596, 610.) The parent has the burden of showing there is no evidence of a sufficiently substantial nature to support the finding or order.[8] (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

B

Diana argues that the potential harm caused by the termination of parental rights outweighs the potential benefit of adoption for the minors. The juvenile court's finding to the contrary, however, was supported by substantial evidence.

Although Diana had positive interactions with the twins during her visits, they did not rely on Diana to have their needs met. Throughout the dependency the minors separated easily from Diana after visits and there was no evidence that her absence from their daily lives affected them adversely. Further, by the end of the dependency the minors were weary of Diana at the start of visits. In December, the social worker

---

8    The Agency suggests this court should adopt a hybrid standard of review, applying both the substantial evidence and abuse of discretion standards, as some courts have done. (See, e.g., *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315 [applying such a hybrid standard].) Diana does not address the applicable standard of review. We conclude that on this record there was no error under either the substantial evidence review or the hybrid standard advanced by the Agency.

10

reported the "children tend not to seek out their mother for attention, comfort and security, which is primarily provided by their paternal grandmother . . . ."

These facts amply supported the juvenile court's finding the children did not have a " 'significant, positive, emotional attachment' " to Diana such that terminating parental rights would result in harm to them.[9] (*Jason J.*, *supra*, 175 Cal.App.4th at p. 936; *Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)  Diana points to no evidence showing the minors would be harmed by severing her rights.  "A biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent."  (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466.)

Further, as described, despite being provided with resources to help her change her behavior, Diana continued to engage in dangerous behavior and place her drug use above the well-being of the minors.  This behavior already resulted in the termination of parental rights to her four older children and continued to threaten to place the twins in harm's way.  At the time of the 366.26 hearing, the minors were doing well in the home of Beverly, who was committed to adopting them and who was meeting their medical,

---

9    Diana asserts the reference to great harm in *Autumn H.*, *supra*, 27 Cal.App.4th at page 575 is at odds with the statute, which she argues "does not impose a rule that the child must suffer great harm in order to apply the exception."  We do not read *Autumn H.* to impose such a requirement.  Rather, as the trial court noted, *Autumn H.* directs the juvenile court to examine the application of the exception "on a case-by case basis, taking into account the many variables which affect a parent[-]child bond" including "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs . . . ."  (*Id*. at p. 576.)

11

developmental and emotional needs. The court was entitled to accept the social worker's opinion that the benefits of adoption for these young children outweighed the benefits of maintaining a relationship with Diana. (*In re Justice P.* (2004) 123 Cal.App.4th 181, 191 [child's interest in stable and permanent home is paramount once a parent's interest in reunification is no longer at issue].)

Finally, despite Diana's preference for guardianship for the minors, the Legislature has decreed that a permanent plan other than adoption "is not in the best interests of children who cannot be returned to their parents. These children can be afforded the best possible opportunity to get on with the task of growing up by placing them in the most permanent and secure alternative that can be afforded them." (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1419; see *Jones T. v. Superior Court* (1989) 215 Cal.App.3d 240, 251 [unlike adoption, guardianship is not "irrevocable and thus falls short of the secure and permanent placement intended by the Legislature"].) The minors, whose needs could not be met by Diana, deserve to have their custody status promptly resolved and their placement made permanent and secure. Substantial evidence supported the court's finding the beneficial parent-child relationship exception to adoption did not apply.

DISPOSITION

The orders are affirmed.

IRION, J.

WE CONCUR:


NARES, Acting P. J.


HALLER, J.