Filed 8/24/20  In re C.O. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

| | |
|---|---|
| In re C.O. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>C.B.,<br><br>      Defendant and Appellant. | E074713<br><br>(Super.Ct.Nos. J281549, J281550 & J281551)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  Christopher B. Marshall, Judge.  Affirmed.

Konrad S. Lee, under appointment by the Court of Appeal, for Defendant and Appellant.

Michelle D. Blakemore, County Counsel, Svetlana Kauper, Deputy County Counsel, for Plaintiff and Respondent.

1

I

INTRODUCTION

C.B. (Mother) and C.O.-N. (Father)[1] have a history of domestic violence, abusing drugs, and neglecting their three daughters: 11-year-old M.O.-B., nine-year-old C.O.-B., and three-year-old C.O. As a result, the San Bernardino County Children and Family Services (CFS) removed their children from their custody and the parents were offered reunification services. Following numerous attempts to reunify with her children, Mother's services were terminated and a Welfare and Institutions Code[2] section 366.26 hearing was set.

At the contested section 366.26 hearing, the juvenile court found Mother failed to meet her burden of proof in demonstrating the parental benefit exception (§ 366.26, subd. (c)(1)(B)(i)) to termination of parental rights, terminated the parents' parental rights, and freed the children for adoption. Mother appeals from the juvenile court's order terminating her parental rights. On appeal, Mother argues the juvenile court erred in not applying the parental benefit exception. We conclude the juvenile court did not err and affirm the order terminating Mother's parental rights.

---

[1] Father is not a party to this appeal.

[2] All future statutory references are to the Welfare and Institutions Code unless otherwise stated.

II

FACTUAL AND PROCEDURAL BACKGROUND[3]

A.      *Prior Dependency Actions*

The family is known to CFS.  Mother had engaged in two formal dependency cases and one voluntary family maintenance case.  On September 2, 2012, M.O.-B. and C.O.-B. were removed from their parents' care due to the parents' substance abuse, the parents' criminal history, Mother's mental health, familial violence, and sexual abuse of the children by a relative.  Mother participated in reunification services and was provided with substance abuse services, domestic violence services, parenting education, and counseling services.  Mother made substantial progress in her services and successfully reunified with M.O.-B. and C.O.-B. in October 2013.  Mother also participated in voluntary family maintenance services from September 7 to November 21, 2016.

On August 21, 2017, M.O.-B., C.O.-B., and C.O. were removed from the parents' custody due to the parents' substance abuse, criminal history and domestic violence history, and Mother's arrest for felony child endangerment.  Mother and Father were offered family reunification services.  Mother reunified with the children in July 2018 and was offered family maintenance services.  Father's services, however, were terminated on July 30, 2018.  On January 30, 2019, the juvenile court dismissed the case

---

[3] The factual and procedural background up until the section 366.26 hearing was set is taken from this court's nonpublished opinion in case No. E074327 (Mother's prior appeal).  (*In re C.O.* (June 30, 2020, E074327) [nonpub. opn.].)

with family law orders giving Mother custody of the children as she had successfully completed her case plan services.

In addition, Mother has a lengthy criminal history beginning in August 2005. Her prior criminal history includes offenses for assault with a deadly weapon in August 2005, possession of methamphetamine in September and December 2005 and May 2006, elder abuse in June 2006, battery against an elderly person in July 2007 and July 2008, and child endangerment in July and November 2011, September 2012, and August 2017.

B. *Current Dependency Action*

The current case is the third dependency action involving Mother and Father. The family again came to the attention of CFS on June 17, 2019, when a referral was received alleging general neglect to the children. It was reported that the children fed themselves while Mother was in her bedroom "'smoking crystal'" and not attending to the children. It was also alleged that Mother did not bathe the children as often as she should and that she yelled, threatened, and cursed at the children when they knocked on her bedroom door.

Mother denied the allegations but admitted using methamphetamines on June 23, 2019. She explained that she started using methamphetamines about a week ago caused by an argument with Father and that she stopped using when she realized she was relapsing. The children denied that Mother was using drugs and reported feeling safe and well taken care of while with Mother. The reporting party, however, informed the social

4

worker that the children and Mother were lying and that she was concerned about the children's safety due to Mother's current drug use.

On June 26, 2019, at a family team meeting, Mother admitted to using drugs and reported using several times in June 2019 and several weeks before June 2019. An aunt, who lived in the family home, noticed Mother's behavior change in April 2019, which was indicative of relapse, and Mother continued to decompensate. Mother signed a declaration agreeing to place her daughters in protective custody. The children were detained and placed in foster care with Mrs. L., with whom they had already been placed during a prior dependency case.

On June 28, 2019, petitions were filed on behalf of the children pursuant to section 300, subdivisions (b) (failure to protect), (g) (no provision for support), and (j) (abuse of sibling).[4]

The children were formally detained at the July 1, 2019 detention hearing. Mother was provided with services pending the jurisdictional/dispositional hearing, visitation once a week for one hour, and ordered to drug test.

CFS recommended the allegations in the petition be found true as amended, no reunification services be offered to the parents, and a section 366.26 hearing be set. On July 1, 2019, Mother tested positive for amphetamines and enrolled in an outpatient drug program a few weeks later at Cedar House. Mother reported that she began using

---

[4] On July 19, 2019, CFS filed amended petitions on behalf of the children, detailing the prior dependency cases, Mother's drug use, and Father's undetermined whereabouts.

5

methamphetamines when she was 17 years old after a physical fight with her sister and used it continuously for 11 years until she was 28 years old. She stopped using for a couple of years when CFS got involved and currently only uses "'a little.'" Mother blamed her sister-in-law for CFS's involvement in this case and believed she had shown significant behavioral changes since her last two cases. Mother desired to engage in services and noted she had enrolled in parenting education classes and had attended Alcoholics Anonymous (AA) meetings on her own.

CFS reported that prognosis for family reunification for Mother was "poor based on her ongoing struggle with sobriety," "neglect of the children," and failure to benefit from services provided to Mother on three different occasions. CFS noted Mother "has shown she has not only failed to rehabilitate, but she has also resisted prior treatment for this problem during a three-year period immediately prior to the filing of this petition." CFS recommended against providing services to Mother because she had "failed or refused to comply with a program of drug or alcohol treatment . . . on at least two prior occasions, even though the programs were available and accessible."

The children were doing well in Mrs. L.'s home and were bonded to her. There were no relatives to consider for placement and Mother wanted the children to stay with Mrs. L. Mrs. L. reported that Mother regularly visited the children, however, during visits, Mother told the children that they would be returning home in five months.

As of August 14, 2019, Mother continued to engage in services. She noted that she had six more parenting education classes and four more therapy sessions and that she

was attending Cedar House three times a week and Narcotics Anonymous (NA) meetings three times a week. Mother tested negative for drugs on July 24, 2019.

The contested jurisdictional/dispositional hearing was held on August 21, 2019. The juvenile court found true the allegations in the first amended petition and declared the children dependents of the court. The court denied reunification services to the parents pursuant to the bypass provisions of section 361.5, subdivisions (b)(10) and (b)(13), and set a section 366.26 hearing. In support of its conclusion, the court noted "the degree of the substance-abuse issue, the length of time of that substance-abuse issue, and the children's deserving permanence and stability." The court provided Mother with two hours supervised visitation per week with the children.

CFS recommended that the section 366.26 hearing be continued for 60 days to allow the permanent plan of adoption to be implemented. CFS noted that due to the children's "significant relationship" with their foster parent, Mrs. L., it was not in their best interest to be removed from Mrs. L.'s home. The children had been placed in Mrs. L.'s home during the prior dependency cases and were bonded to Mrs. L. C.O. had been placed in Mrs. L.'s care for the most of her young life and considered "her as a mother." The older children also called Mrs. L. "'mom,'" considered their foster home their home, and viewed their foster family as their family, even though the two older girls knew Mother is their biological mother and desired to go home with Mother.

Mother continued to regularly visit the children and the visits were "relatively appropriate." Mother had to be reminded a few times as to what was appropriate to tell

7

the children. For example, Mother had promised the children that they were going to come home, had informed them how hard she was working to complete her classes, and had told the older two girls to go to court and beg the judge to send them home. At times, during once a week phone calls with the children, Mother would call the children while she was with Father in Mexico. Father's niece was occasionally in their care during these phone calls. The calls upset the two older girls because they were not able to be with Mother and Father but Mother and Father had the niece with them. These contacts also had at times made it hard for the older girls to accept the prospective adoptive home as their permanent home.

On December 6, 2019, less than six months since the children were removed from her care, Mother filed a section 388 petition, seeking return of the children to her care or, alternatively, family reunification services and liberalized visitation. In support, Mother attached letters from Cedar House, certificates of competition, letters in support, sign-in sheets, a letter noting Mother was seeking mental health services, and a declaration from Mother. Mother asserted that she had completed the outpatient treatment program at Cedar House in November 2019, she had consistently tested negative for drugs since July 2019, and she had maintained her sobriety by enrolling in the aftercare program and attending AA/NA meetings. She also noted that she had completed a 12-week parenting program, eight individual counseling sessions, and was seeking mental health services. Mother claimed that the requested order was in the best interest of the children because

8

she had consistently visited the children, there were no concerns about her visits, and there was a strong parental bond between her and the children.

On December 6, 2019, the juvenile court denied Mother's section 388 petition without an evidentiary hearing, finding the request did not state new evidence or a change of circumstances and the proposed change of order was not in the children's best interest.

On December 11, 2019, the juvenile court continued the section 366.26 hearing for an adoption assessment.

On December 12, 2019, Mother filed a timely notice of appeal from the juvenile court's order summarily denying her section 388 petition.[5]

The section 366.26 report dated February 10, 2020, recommended terminating parental rights and freeing the children for adoption by Mrs. L. Due to the extensive relationship the children had with Mrs. L. during the previous and current dependency proceedings, and because they had maintained contact with Mrs. L. after their second reunification with Mother, Mrs. L. was classified as a non-related extended family member (NREFM).

The children continuously resided with Mrs. L. after their removal from their parents in June 2019. Mrs. L. had been a part of the children's lives since 2017, when they were placed with her family during the prior dependency case and had not exhibited any issues adjusting to the home. The social worker observed all three children were

---

[5] On June 30, 2020, this court affirmed the juvenile court's order denying Mother's section 388 petition in case No. E074327.

very comfortable with Mrs. L., and the children looked to Mrs. L. for their daily needs. The social worker believed Mrs. L. took good care of the children.

Mrs. L. met the children's emotional, medical, developmental, and educational needs. Mrs. L. reported that all three children slept and ate well. The children enjoyed playing with their tablets and playing in the backyard with age appropriate toys. Mrs. L. also took M.O.-B. and C.O.-B. to counseling sessions. Mrs. L. reported that M.O.-B. exhibited anxiety symptoms, such as rocking back and forth, fidgeting, and biting her nails. Mrs. L. believed M.O.-B. and C.O.-B. needed more frequent therapy sessions.

In addition, Mrs. L. was attached to the children and loved them. Mrs. L. wished to legalize her parental relationship with the children because she did not want them moving from home to home. Permanency and stability were the key considerations for Mrs. L. Mrs. L., therefore, was not interested in legal guardianship. Mrs. L. explained that she "'fel[t] like [they had] a mother-daughter relationship'" and that "[the children] call[ed] [her] mom even when their mother [was] around." The social worker observed that the children clearly appeared to share a parent-child relationship with Mrs. L. and that the children and Mrs. L. had developed a mutual attachment.

When asked about the prospect of being adopted, M.O.-B. and C.O.-B. responded that they liked living with Mrs. L. and called her "'mom.'" However, they also wanted to return to Mother. M.O.-B. and C.O.-B. asserted that they wanted to stay with Mrs. L., if they could not return to Mother. C.O. was too young to express her feelings about adoption.

Mother maintained consistent visits with the children during the reporting period, and the visits were "relatively appropriate." Mrs. L. was open to maintaining supervised contact with Mother as long as the visits were appropriate and were in the children's best interest.

By February 4, 2020, CFS moved Mother's supervised visits to a more structured environment at the Foster Family Agency because of Mother's continued inappropriate comments to the children and her conduct during the visits. Mother instructed the older children to tell the court they did not want to be adopted and to beg the judge to send them home. Furthermore, Mother reportedly attempted to steal an item from a store at the mall during one of the visits with the children. Mother also stated that she wanted a maternal aunt to adopt the children. However, the phone number provided by Mother was incorrect and the maternal aunt never contacted the social worker. CFS suspected that Mother was attempting to convince the maternal aunt to take the children, as the maternal aunt had never expressed interest in placement of the children with her during any of the dependency proceedings. In addition, CFS did not believe it was in the children's best interest to be moved "due to the significant bond that they ha[d] with their current foster mother who [was] now more of a NREFM to the children."

The contested section 366.26 hearing was held on February 10, 2020. At that time, the juvenile court heard testimony from M.O.-B., C.O.-B., and Mother. After counsel explained the difference between legal guardianship and adoption, M.O.-B., who was 10 years old at the time, testified that she preferred being adopted "[b]ecause it's like

11

stable than [*sic*] legal guardianship." She explained that she preferred a future that was more stable and that she understood adoption was the best option for her. Nonetheless, M.O.-B. also enjoyed her visits with Mother and wanted to continue to visit Mother.

During the visits, M.O.-B. recalled she would "[d]ance, talk, and sit down with [Mother]." M.O.-B. further reported that sometimes she cried when the visits ended and that she missed Mother. She explained that she would be "[s]ad" if she could not see Mother anymore and that she loved Mother. M.O.-B. also testified that she called Mother "'mom,'" but she also called Mrs. L. "mom" because "[Mrs. L.] [took] care of us and she lov[ed] us." M.O.-B. recalled the recent incident at the mall where Mother shoplifted two toys for the children and believed Mother's conduct "[was] bad."

On re-cross-examination, M.O.-B. stated that she would rather live with Mother in the future than be adopted because she loved her, "was safe with her and she took care of [the children] very well." However, she noted that if she could not go home with Mother, she preferred staying with Mrs. L. and being adopted.

C.O.-B. testified that Mrs. L. was "a good mom and [took] care of [the children] good." When asked if C.O.-B. preferred legal guardianship over adoption, the child responded she wanted to be "[a]dopted." C.O.-B. felt that Mrs. L. was her mom "[b]ecause she [took] care of us, and she lov[ed] us." C.O.-B. also reported that she had "[g]ood" visits with Mother and believed Mrs. L. would continue to allow the children to visit Mother after they were adopted. C.O.-B. enjoyed spending time with Mother, hugged Mother, and cried at visits but she did not know how much time she wanted to

12

spend with Mother. C.O.-B. noted that she wanted to go home to her Mother because she missed her and loved her. She also reported being "[s]ad" at the thought she could not visit Mother.

On re-cross-examination, C.O.-B. testified that she wanted to live with Mother in the future because she loved Mother, Mother "didn't hurt [them]," and Mother fed them, took care of them, and "did everything that [they] needed." However, if she could not return to Mother, she preferred to be adopted.

Mother testified that prior to the most recent, third removal, the children resided in her custody and that she was the primary caregiver. Mother disagreed with the plan of adoption and preferred legal guardianship. She stated that the children were attached to her and showed their affection by sleeping with Mother and hugging her. The children also participated in family time by watching television and movies with Mother.

Mother further explained that she maintained supervised visits with the children, twice a week for two hours. She had supervised phone calls once a week for 10 minutes when the case began. Mother also saw the children by means of FaceTime for five to 10 minutes once a week. Mother described M.O.-B. and C.O.-B. being "happy" during the beginning of their visits. At the end of visits, M.O.-B. cried and wanted to go home, and C.O.-B. did not speak but cried at least once and asked to go home during the last visit. Mother believed C.O.-B. was happy because "she's with a good foster lady." Mother hugged C.O. a lot, kissed her, and fed her. Mother stated that she loved the children and

13

believed the children would suffer emotionally if they could not maintain contact with her.

Mother believed termination of parental rights would be detrimental to the children "[b]ecause I want to be in their life, and they—I want them to be with me. It's what they want, right—they want to come home." On cross-examination, Mother acknowledged that she had only had supervised visitation with the children and that this was the children's third removal.

CFS argued for termination of parental rights. The children's counsel joined CFS's argument and pointed out that Mother's role in the children's lives was contrary to that of a parent. Mother's counsel believed a lesser permanent plan was appropriate based on the parental beneficial relationship exception.

Following arguments, the juvenile court found the children were specifically and generally adoptable. The court also found that Mother had not met her burden of establishing the parental benefit exception, noting Mother's testimony was not credible in some instances. The court believed Mother had been asking the children to state they did not want to be adopted and that they wanted to return home. The court acknowledged that Mother and the children shared an emotional bond from which the children would derive an incidental benefit. The court, however, concluded that was not sufficient to establish the exception. The court further concluded that Mother failed to show severing the natural parent-child bond would deprive the children of a substantial, positive emotional attachment such that the children would be greatly harmed. The court

14

considered the wishes of the children consistent with their ages and noted the children's need for permanency and stability. The court also noted that the children and Mrs. L. had indicated Mrs. L. was willing to allow the children to maintain contact with Mother, and Mother had testified Mrs. L. had looked after the children well and that she got along with Mrs. L. The court thereafter terminated parental rights and freed the children for adoption.

On February 11, 2020, Mother timely filed a notice of appeal challenging the findings and orders made at the section 366.26 hearing.

III

DISCUSSION

Mother asserts the juvenile court erred in failing to apply the parental benefit exception to terminating parental rights under section 366.26, subdivision (c)(1)(B)(i), because there was substantial evidence that she maintained regular visitation with the children and that the children would benefit from continuing the parent-child relationship. We disagree.

The Legislature prefers adoption where possible. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.) Once the juvenile court finds a child is adoptable, the parent bears the burden of proving one of the exceptions to terminating parental rights exists. (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1343.) "Because a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will

15

prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.)

The parental benefit or beneficial relationship exception applies where "'[t]he parents . . . have maintained regular visitation and contact with the minor and the minor would benefit from continuing the relationship.'" (*In re Derek W.* (1999) 73 Cal.App.4th 823, 826.) The parent has the burden of proving that the exception applies. (*Ibid*.) "'Sporadic visitation is insufficient to satisfy the first prong . . .' of the exception. [Citation.] Satisfying the second prong requires the parent to prove that 'severing the natural parent-child relationship would deprive the child of a *substantial*, positive emotional attachment such that the child would be *greatly* harmed. [Citations.] A biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent.' [Citation.]" (*In re Marcelo B.* (2012) 209 Cal.App.4th 635, 643.)

The issue for purposes of the statutory beneficial relationship exception "is not whether there was a bond between [parent] and [child]. The question is whether that relationship remained so significant and compelling in [the child's] life that the benefit of preserving it outweighed the stability and benefits of adoption. The '"benefit"' necessary to trigger this exception requires that '"the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and

16

quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated."' [Citations.]" (*In re Anthony B.* (2015) 239 Cal.App.4th 389, 396-397 (*Anthony B.*).)

"'[T]he emotional attachment between the child and parent must be that of parent and child rather than one of being a friendly visitor or friendly nonparent relative, such as an aunt.'" (*In re Jason J.* (2009) 175 Cal.App.4th 922, 938 (*Jason J.*).) The parent must show "more than frequent and loving contact" or pleasant visits. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 229.) "'A biological parent who has failed to reunify with an adoptable child may not derail adoption merely by showing the child would derive some benefit from continuing a relationship maintained during periods of visitation with the parent. [Citation.] A child who has been adjudged a dependent of the juvenile court should not be deprived of an adoptive parent when the natural parent has maintained a relationship that may be beneficial to some degree, but that does not meet the child's need for a parent.'" (*Jason J.*, at p. 937, italics omitted.)

The beneficial relationship must be examined on a case-by-case basis, taking into account the many variables that can affect the parent-child relationship, including the age of the child, the portion of the child's life spent in the parent's custody, and the positive

and negative effects of interaction between parent and child.  (*Anthony B.*, *supra*, 239 Cal.App.4th at pp. 396-397; *In re G.B.* (2014) 227 Cal.App.4th 1147, 1166.)

"We apply the substantial evidence standard of review to the factual issue of the existence of a beneficial parental relationship, and the abuse of discretion standard to the determination of whether there is a compelling reason for finding that termination [of parental rights] would be detrimental to the child.  [Citations.]"  (*Anthony B.*, *supra*, 239 Cal.App.4th at p. 395; *In re Noah G.* (2016) 247 Cal.App.4th 1292, 1300-1301 (*Noah G.*).)

Whether there is a beneficial parent-child relationship is a factual issue; thus, the substantial evidence standard applies to this component of the court's decision.  (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314.)  But whether there is a compelling reason to determine the child would suffer detriment if parental rights are terminated is a "'quintessentially' discretionary decision" (*id.* at p. 1315), because it requires the court to "determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption."  (*Ibid.*)

In this case, the juvenile court heard testimony from Mother, M.O.-B. and C.O.-B and considered the evidence presented by the parties.  The court, however, found that the parental benefit exception did not apply.  Substantial evidence supports the juvenile court's finding that the parental exception did not apply.

Although Mother regularly visited and made contact with the children, the record amply shows Mother failed to establish that she shared a beneficial parental relationship with the children. By the time of the section 366.26 hearing on February 10, 2020, the children had spent approximately 31 months out of Mother's care and custody. For C.O. that meant she had spent more than half of her young life in foster care, while, M.O.-B and C.O.-B spent almost half of their lives removed, returned, and re-removed from Mother's care and custody. M.O.-B and C.O.-B recognized the instability in their lives and testified they wanted stability and permanency.

The children also testified that they loved Mother, missed her, and cried when visits ended, and they would be sad if they could not see her. They further stated that Mother had never harmed them, they felt safe with her, and wanted to live with Mother. However, M.O.-B and C.O.-B also acknowledged that they loved and cared for Mrs. L. and that they called her "mom." While, as the juvenile court found, "there [was] an emotional bond between the children and the mother" and the children derived some benefit from that relationship, the evidence of frequent and loving contact was not sufficient to establish that Mother occupied a parental role in the children's lives. (*In re Breanna S*. (2017) 8 Cal.App.5th 636, 646.)

Contrary to Mother's claims that she had never harmed her children, the record shows the children had suffered trauma and instability for years as a result of Mother's unresolved substance abuse issues. CFS has been involved in the family's life since 2012 and the children were removed from Mother's care three times. For over 18 years,

19

Mother has repeatedly been unable to maintain her sobriety, even after she received numerous services during the course of several dependencies and voluntary services. Under similar circumstances several courts have found the beneficial relationship exception inapplicable. (See *Noah G.*, *supra*, 247 Cal.App.4th at pp. 1302, 1304 [in considering the beneficial relationship exception, "the juvenile court could properly focus on the mother's unresolved substance addiction issues because the children became dependents of the court due to her drug abuse"; citing mother's continuing drug abuse as "evidence continuing the parent-child relationship would not be *beneficial*"].)

Furthermore, even if Mother had demonstrated the existence of a beneficial parental relationship, the juvenile court did not abuse its discretion by determining that the benefit of maintaining the children's relationship with Mother was outweighed by the benefits of adoption. Although Mother's interaction with the children during supervised visitation was positive, there is little in the record to support the conclusion that the children would be harmed, much less "'greatly harmed,'" by termination of parental rights. (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1235.) Mrs. L. occupied the role of the parent in the children's lives in the second and third dependencies. The children looked to Mrs. L. for their daily needs. Mrs. L. provided for the children's medical, emotional, and educational needs. All three children appeared to meet their developmental milestones, slept and ate well, and appeared to be well and happy in Mrs. L.'s home. Mrs. L. also took M.O.-B and C.O.-B to counseling sessions, and she noted the children needed additional, more frequent therapy sessions.

Moreover, the children and Mrs. L. were mutually attached. C.O. had been placed with Mrs. L. for most of her life and considered Mrs. L. her mother. M.O.-B. called Mrs. L. "'mom'" because "[Mrs. L.] [took] care of us and she lov[ed] us." C.O.-B. also felt that Mrs. L. was her mom "[b]ecause she [took] care of us, and she lov[ed] us." Mrs. L. explained that "'[the children] call[ed] [her] mom even when their mother [was] around.'" The children also considered Mrs. L. and her family as their own family. The record demonstrates that it was in the children's best interest to be adopted by Mrs. L.

Mother simply did not meet her burden of showing that the bond between her and the children was so strong and beneficial that it outweighed the benefit the children would receive from having a stable, adoptive home. Mother bore the burden of showing that her relationship with the children "promotes the well-being of the child[ren] to such a degree as to outweigh the well-being the child[ren] would gain in a permanent home with new, adoptive parents." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)

Mother relies on *In re Scott B.* (2010) 188 Cal.App.4th 452 (*Scott B.*) to support her position the juvenile court should have ordered legal guardianship as the appropriate permanent plan for the children. In that case, the appellate court reversed the juvenile court's order terminating the mother's parental rights, holding that compelling reasons existed to apply the parental relationship exception to termination of parental rights, and remanded the matter to the lower court, suggesting that the court order legal guardianship as the appropriate permanent plan for the child. (*Id.* at pp. 471-473.)

In *Scott B.*, *supra*, 188 Cal.App.4th 452, the child suffered from attention deficit hyperactivity disorder and autism, needed special education services, had behavior problems at school, had problems interacting with his peers, and had bladder control issues. (*Id*. at pp. 455-456.) "He was nearly nine years old when he was placed with his foster family and thus had spent nearly all of his life living with Mother. After he was removed from her care he had consistent weekly visits with her and he looked forward to the visits." (*Id*. at p. 471.) The child's court-appointed special advocate reported that Scott and his mother had a very close bond and that disrupting that relationship would be detrimental to Scott. (*Ibid*.) Scott also "repeated[ly]" insisted that he preferred to live with his mother. (*Ibid*.) The Court of Appeal concluded that these facts presented "a compelling reason for finding that termination of parental rights is detrimental to the minor." (*Ibid*.)

The court further concluded: "Mother provides stability to Scott's life. That is what adoption is supposed to do, but it may not in this case. Given Scott's strong emotional attachment to Mother, his continued precarious emotional state, and his history of regressing and running away when he is stressed, there is a very good chance that he will have a meltdown if his usual frequent visitation with Mother does not continue. The only way to avoid that serious emotional and developmental setback and ensure that Scott's usual visitation with Mother continues is by court order. The only way to have such an order is to have Scott's permanent plan be legal guardianship or long-term foster care. Between the two plans, legal guardianship is the Legislature's stated preference as

22

it provides much more stability for a minor child . . . ." (*Scott B.*, *supra*, 188 Cal.App.4th at p. 472.) The court agreed with the department's statement that "'what is at stake is the fundamental question of whether [the child] will continue to thrive, as he has done since being placed with [his foster mother].' Termination of parental rights is unnecessary given that a legal guardianship will provide [the child] with stability in his life." (*Ibid.*, fn. omitted.)

The facts of *Scott B.* are distinguishable from those here. Unlike in this case, in *Scott B.*, there was substantial evidence that the child was at risk of suffering a serious emotional and developmental setback were he no longer able to see his mother. The same cannot be said here. Here, the children do not have any special needs, and there is no evidence to suggest that the children were at risk of suffering developmental setbacks. Moreover, Mrs. L. met all the children's emotional, medical, and educational needs. Mother admitted that Mrs. L. was a good caregiver. Furthermore, although the two older girls were conflicted on being adopted, the children showed no potential emotional setback when the social worker discussed the issue of adoption with them. Upon learning that they might be adopted, M.O.-B. and C.O.-B. continued to thrive in the care of Mrs. L. and clearly stated that they wished to remain with her and be adopted "[b]ecause it's like stable than [*sic*] legal guardianship." C.O. spent most of her life with Mrs. L. and knew Mrs. L. as the only stable parent in her life.

Mother showed no substantial, positive attachment to the children such that severing the parent-child bond would greatly harm the children.  M.O.-B. and C.O.-B. testified that they would be sad if they did not see Mother again, but there was no evidence to suggest they would be greatly harmed.  Indeed, they wanted to be adopted if they could not return home.  Even if Mother had demonstrated a beneficial parental relationship, the juvenile court did not abuse its discretion by determining that its benefits were outweighed by those of adoption.  Mrs. L. wished to adopt the children and provide them with permanency and stability.  The children had been removed from Mother's care three times.  The juvenile court was well within the bounds of reason to conclude that the children's permanency and stability outweighed the benefits of a continued relationship with Mother under a lesser permanent plan.

Mother's reliance on *In re S.B.* (2008) 164 Cal.App.4th 289 (*S.B.*) is also not helpful.  There, the sole issue was whether the father occupied a parental role in his daughter's life.  In concluding that he did, the appellate court relied on circumstances that simply are not present in this case.  Unlike Mother here, the father in S.B. was his daughter's primary caregiver for three years, which was well over half of her life.  (*Id.* at pp. 293, 298.)  In addition, a bonding study revealed a "'fairly strong'" bond between the father and his daughter—one that was reflected during visits when she would nestle into his neck and whisper that she loved him and missed him and wanted to live with him. (*Id.* at pp. 295, 298.)  Finally, the father had complied with "'every aspect'" of his case plan, "immediately" obtaining and maintaining sobriety and seeking medical and

psychological services as soon as his daughter was removed from his care. (*Id.* at p. 298.) Here, Mother's efforts to resolve the issues that led to the dependency proceedings fall drastically short of the father's in *S.B.* In addition, the children had been removed from Mother's care three times due to the same issues. Furthermore, unlike *S.B.*, the evidence in the record does not show that Mother and the children had an emotionally significant relationship such that severing the parent-child bond would greatly harm the children. Therefore, the facts in *S.B.* are not analogous to those in this case.

Mother also relies on *In re Amber M.* (2002) 103 Cal.App.4th 681 (*Amber M.*) and *In re Brandon C.* (1999) 71 Cal.App.4th 1530 (*Brandon C.*) to support her position that the children would benefit from a continued parent-child relationship with her. Neither case aids Mother's argument because Mother has only had supervised visits with the children.

Although the *Amber M.* court concluded the juvenile court erred by declining to apply the beneficial relationship exception, the evidence there was markedly different from the facts of this case. In *Amber M.*, *supra*, 103 Cal.App.4th 681, all three children spent a significant time with the mother prior to removal, including the oldest child spending her first five years in the mother's care. (*Id.* at p. 689.) Moreover, in *Amber M.*, the child advocate, bonding psychologist, and one of the children's individual therapists opined the mother had a strong bond with the children, and the court noted that "[t]he common theme running through the evidence from the bonding study psychologist,

the therapists, and the [child advocate] is a beneficial parental relationship that clearly outweighs the benefit of adoption." (*Id*. at p. 690.) The court also noted "[t]he social worker, the only dissenting voice among the experts, provided no more than a perfunctory evaluation of Mother's relationship to the children." (*Ibid*.) Contrary to Mother' claim, the evidence here, as previously discussed, is markedly different. We conclude *Amber M*. is factually distinguishable.

Mother also compares this case to *Brandon C*., *supra*, 71 Cal.App.4th 1530, an appeal by a child welfare agency from a juvenile court's decision to apply the beneficial parent-child relationship exception and order legal guardianship. In *Brandon C*., the appellate court affirmed the juvenile court's order selecting guardianship with the paternal grandmother as the permanent plan for twin boys, rather than adoption, after finding the parent-child relationship exception to termination of parental rights applied. Noting the governing legal standard, the appellate court stated, "Courts have required more than just 'frequent and loving contact' to establish the requisite benefit for this exception." (*Id*. at pp. 1533-1534.) Evaluating conflicting evidence under the substantial evidence standard of review, the court concluded the evidence was sufficient to support the juvenile court's guardianship order. (*Id*. at p. 1538.)

That analysis, which properly deferred to the juvenile court's assessment of the nature of the interaction between parent and child, fails to demonstrate the court in this case was compelled to find Mother's relationship with the children, while loving and, perhaps, frequent, was parental in nature. The juvenile court's decision in *Brandon C*.,

affirming the application of the exception, does not support the court's contrary decision here, which is based on different facts. Furthermore, *Brandon C.* is factually distinguishable because in that case the caregiver (the paternal grandmother) was elderly, had multiple health problems, and told the court she "did not think it would be in the boys' best interest to terminate their relationship with mother and father." (*Brandon C.*, *supra*, 71 Cal.App.4th at p. 1533.)

There is no indication here that Mrs. L. has any similar barriers to caring for the children, and Mrs. L. stated she wished to adopt the children and provide them with a stable, loving home. Moreover, the children and Mrs. L. were mutually attached, the children loved and cared for Mrs. L., and they called Mr. L. "mom" even when Mother was around. In addition, the two older girls said they desired to be adopted by Mrs. L. if they could not be returned to Mother's care. The juvenile court here properly considered all the facts, including the testimony of Mother, M.O.-B. and C.O.-B., Mother's numerous failed reunification efforts, and the children's need for stability and permanency, before rejecting the beneficial parental relationship exception.

Based on the foregoing, the juvenile court did not err in determining that Mother failed to establish that the beneficial parental relationship exception to termination of parental rights applied.

IV

DISPOSITION

The juvenile court's order terminating parental rights is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:


MILLER
Acting P. J.


FIELDS
J.