Filed 12/21/23  In re Emily R. CA1/5
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| In re EMILY R., a Person Coming Under the Juvenile Court Law. | |
| HUMBOLDT COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES, Plaintiff and Respondent, v. NAKIA C., Defendant and Respondent; EMILY R., a Minor, etc., Appellant. | A167608 (Humboldt County Super. Ct. No. JV2000079) |

Minor, Emily R., appeals from the juvenile court's order selecting legal guardianship as Emily R.'s permanent plan based on application of the parental benefit exception under Welfare and Institutions Code section 366.26, subdivision (c)(1)(B)(i).[1]  Minor also contends the Humboldt County Department of Health and Human Services (Department) failed to comply with the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.)

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise stated.

1

and related California law (Welf. & Inst. Code, § 224 et seq.). The Department concedes the evidence in the record lacks support for the trial court's finding that ICWA does not apply, and the Department states its intention to comply with ICWA's inquiry and notice requirements in the ongoing dependency proceeding. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.  *Section 300 Petition*

On June 2, 2020, the Department filed a dependency petition alleging that Emily R., who was then five years old, came within the jurisdiction of the juvenile court under subdivisions (a) and (b)(1) of section 300. The petition alleged that on May 31, 2020, mother was arrested for driving under the influence of alcohol and for child endangerment. Emily was in the car at the time of mother's arrest. The petition further alleged that mother had a history of substance abuse, including alcohol and methamphetamine, which previously interfered with her ability to provide regular care for her older children, and that her decision to drive under the influence with Emily in the car put the minor at serious risk of physical harm.

On June 3, 2020, the juvenile court detained Emily, and she was placed in the care of her paternal aunt. The Department's July 15, 2020 jurisdiction report summarized 18 prior referrals regarding mother, alleging general neglect, physical abuse and caretaker absence. The Department also reported on mother's criminal history, including multiple arrests for reckless driving, driving without a license, driving under the influence, drug possession and probation violations.[2] It further summarized the factual

---

[2] Mother reported that Emily's father was Aaron R. The Department reported that father had multiple prior felony convictions and was currently incarcerated in Oregon and would not be released until at least March 2035. Father is not a party to this appeal.

allegations of the May 31, 2020 driving under the influence incident and mother's statement to the social worker that she " 'made a big mistake' . . . ." Mother did not attend the July 15, 2020, jurisdiction hearing, but her counsel informed the juvenile court that she had enrolled in the Alcohol and Other Drugs (AOD) program and Narcotics Anonymous (NA). The juvenile court sustained the petition and found Emily to be a person described by section 300, subdivisions (a) and (b)(1).

The Department's August 13, 2020 disposition report recommended that Emily be declared a dependent of the court and that mother be offered reunification services. The Department reported that mother visited Emily virtually and in person and called Emily twice a day to help her adjust to living with her aunt. The visits went well, and the Department stated mother and Emily were "very close to each other," "communicate[d] with each other and [were] affectionate."

The juvenile court declared Emily a dependent of the court and ordered her removed from parental custody. It also ordered reunification services for mother.

## II.   *Six-month Review Hearing*

The Department's February 16, 2021, status review report stated Emily was a happy, energetic child with no major health issues and was developmentally on track. She did not display any behaviors indicating a need for counseling. Mother visited Emily consistently from August 2020 to October 2020 and interacted well with her. In October 2020, visitation was modified to unsupervised. Mother returned Emily late after visits and in clothes that did not fit. Mother also struggled to obtain a reliable driver for the visits. The paternal aunt told the Department that Emily said mother drove during visits and that mother had been in verbal arguments with

3

another adult in front of Emily. This made Emily sad. The Department returned to supervised visitation.

Initially, mother adequately participated in the services in her case plan, but later her attendance became inconsistent. In December 2020, she tested positive for methamphetamine. She also failed to participate in the recommended parenting program and did not obtain a mental health assessment.

At the six-month review hearing on February 16, 2021, the juvenile court found mother made minimal to no progress in her case plan and continued reunification services.

## III. *Twelve-month Review Hearing*

In advance of the 12-month review hearing, the Department reported that mother struggled to maintain her sobriety. In May 2021, mother obtained a mental health evaluation recommending that she take medication, but the medication made her tired and she stopped taking it. During this period, mother was arrested three times: for public intoxication in March 2021, for public intoxication and possession of a controlled substance in April 2021, and for felony and misdemeanor warrants in June 2021. She also failed to participate in the agreed upon parenting education program.

Emily remained with her paternal aunt. The minor began receiving weekly counseling services to address appropriate social boundaries and appropriate communication of emotions.

Supervised visitation continued; however, mother missed approximately 16 of 33 scheduled visits. The visitation log the Department attached to its report indicated that many of the missed visits were due to illness of either mother or Emily or because the visitation supervisor was not available. The Department reported that Emily looked forward to the visits

4

and always appeared happy to see mother. Mother and Emily told each other they love one another.

The Department recommended that the juvenile court terminate reunification services, due to mother's lack of engagement, and set a section 366.26 hearing. However, it also stated it would support additional services if mother agreed to participate in an inpatient treatment program. Mother requested a contested 12-month review hearing and asked for additional time to engage in reunification services.

The juvenile court held a contested review hearing on August 11, 2021, at which mother and the Department's social worker testified.[3] The juvenile court found that mother made adequate progress on her case plan and that she "consistently and regularly contacted and visited the child . . . ." It ordered continued reunification services.

## IV. *Eighteen-month Review*

The Department reported that mother initially struggled during this period. She was incarcerated for 17 days in August and September 2021, causing her to miss four consecutive visits.[4] Visitation was suspended. Following her release from jail, mother entered a 30-day inpatient treatment program for substance abuse, anger management and mental health treatment, and then moved to a sober living home. She attended individual therapy and NA. However, she did not complete the recommended parenting program.

---

[3] The reporter's transcript from this hearing is not part of the appellate record. The juvenile court's minute order states testimony was received from mother and the Department's social worker.

[4] It is unclear what led to mother's incarceration, but the Department's report states she was convicted on September 8, 2021, of violating a court order to prevent domestic violence. (Pen. Code, § 273.6, subd. (a).)

Once mother entered the inpatient treatment program, she consistently visited Emily on the weekends. When she moved into the sober living facility, mother continued supervised visits with Emily twice a week for two hours at a time. Emily's paternal aunt reported some regression in Emily's behavior after visits.

The Department reported that Emily was doing well in school and was continuing with counseling. At the beginning of the school year, Emily expressed that she missed people in her life, including her mother.

At the 18-month review hearing, the juvenile court agreed with the Department's recommendation to extend reunification services.

## V.    *Twenty-four-month Review*

The Department reported that mother moved out of the sober living home in February 2022 and into a motel room provided to her through a housing assistance program. Mother had extended visits with Emily while living at the motel. While Emily was in mother's care, she was frequently late to summer school or did not attend. When mother returned Emily to her paternal aunt, Emily often did not have all of her belongings. Mother's behavior began to deteriorate during this period, and she said she was depressed. Mother was asked to leave the motel due to poor interactions and behavior.

On August 13, 2022, while Emily was in mother's care, mother was accused of stealing someone's truck. Emily did not feel safe and asked someone to call her paternal aunt, who came to pick her up. The paternal aunt reported that mother appeared visibly intoxicated and that Emily said mother left her alone in the motel room. Mother provided a variety of inconsistent and confusing explanations about the incident. Emily also reported to the social worker that mother sometimes left her alone at the

6

motel, mother gave Emily a pocket knife, mother smoked cigarettes often, and mother bought "adult" beverages. The paternal aunt reported that Emily mentioned a gun mother put on her nightstand. Mother told the social worker that she gave Emily a small pocketknife to use to cut flowers and that she only left Emily alone to go outside to smoke cigarettes. Regarding the gun, mother said, "It's a plastic gun."

The Department attached a letter from a social worker at Emily's school which stated that Emily was late or missed summer school when she was in mother's care. When Emily did come to school while she was in mother's care, the school staff observed that she often did not have her backpack; was hungry; was dressed inappropriately for the weather; and was tired, more emotional, and less engaged.

The Department noted the relationship between mother and Emily but concluded that after 28 months of reunification services, it continued to have significant concerns about mother's ability to adequately care for Emily. The Department recommended the juvenile court terminate reunification services, set a section 366.26 hearing to terminate parental rights, and consider adoption by the paternal aunt as Emily's permanent plan.

On November 16, 2022, following a contested 24-month review hearing,[5] the juvenile court issued its ruling terminating reunification services and setting a section 366.26 hearing. The juvenile court found that mother made minimal progress overall and that while mother and Emily enjoyed many visits, mother's lack of consistency had negative effects on Emily. The juvenile court granted de facto parent status to the paternal aunt

---

[5] The reporter's transcript of the November 9, 2022, 24-month review hearing is not part of the appellate record. The minute order indicates that there was testimony from the social worker, the paternal aunt, and mother.

and identified adoption by the paternal aunt as the proposed permanent plan.

## VI.  *Combined Section 366.26 and Section 388 Hearing*

On February 15, 2023, mother filed a section 388 petition based on change of circumstances alleging that she was on psychotropic medication and was receiving treatment in a dual recovery program.  She was testing negative for drugs and alcohol, had obtained employment, had had no police contact, was continuing individual therapy, and completed a parenting program.  She further alleged she had maintained consistent positive visitation with Emily, and mother believed Emily wanted to return to her care.  Mother requested either that Emily be returned to her care or that mother be given another six months of reunification services and that the 366.26 hearing be vacated.  Mother's petition attached a letter from mother's mental health therapist stating that mother had bipolar disorder and posttraumatic stress disorder.  Mother's therapist further stated that mother had made significant progress since she began taking medication.  Mother's therapist had observed mother's supervised visit with Emily and found that they had "a very close bond . . . ."  The therapist stated that Emily stayed close to mother during the visit, which the therapist believed indicated Emily feels safe with mother and experiences loss when she must leave mother.

The Department submitted reports acknowledging that mother had made positive progress in the prior two months.  It also reported on the positive visits[6] between mother and Emily, the bond between them, and their

---

[6] The Department reported that between October 2022 and February 2023, mother attended 12 of 18 visits.  The Department's visitation log indicates that four visits were canceled by mother.  Several other visits were canceled because they fell on a holiday.  The visit supervisor described the visits as positive and mother as attentive and engaged.  During one visit,

8

stated love for one another. However, given mother's history of unstable behavior, the Department continued to believe that adoption was in Emily's best interest. The Department reported that although mother's relationship with Emily was close, it was "not consistent and stable such that it outweighs the benefit of stability and permanence that adoption would provide . . . ." Emily had formed a strong attachment to her paternal aunt, with whom she had lived for two and a half years, and the paternal aunt was willing to adopt Emily.

On March 15, 2023, the juvenile court held a combined section 366.26 and section 388 hearing. Mother testified about her recent progress in managing her bipolar disorder and substance abuse issues. She further testified about how excited Emily was to see her during their visits. Emily would run and jump on mother. At the end of some visits, Emily complained of a stomach ache, which mother believed was because Emily was upset. Mother believed Emily was "panicking" about adoption and that she wanted to be with Mother. Mother believed that she and Emily had a strong bond and that it would not be healthy for Emily if mother were cut out of Emily's life. Mother was concerned that if the paternal aunt adopted Emily, mother would not be permitted to visit Emily.

The Department social worker testified that mother had a pattern of doing well for a period and then regressing. The social worker continued to believe that adoption was in Emily's best interests because it is the most permanent plan for her. The paternal aunt was open to future visitation

---

mother was described as very emotional after Emily left. During two of the visits, Emily complained of not feeling well.

between mother and Emily, but she did not want to supervise the visits herself.[7]

The juvenile court heard closing arguments from counsel and then denied mother's section 388 petition. However, the court found that it would "be in Emily's best interests that the Court proceed with the less permanent plan of legal guardianship, instead of adoption for Emily. I think that termination of Mother's parental rights would not be appropriate at this time, given the obvious loving relationship between Emily and . . . her mother . . . ." The juvenile court continued the section 366.26 hearing for entry of the findings and orders.

On April 10, 2023, at the continued section 366.26 hearing, the juvenile court entered a permanent plan of legal guardianship for Emily. The paternal aunt was appointed guardian. It further ordered supervised visitation between mother and Emily once a month, for four hours. The juvenile court scheduled a six-month postpermanency review hearing and ordered that dependency jurisdiction was not terminated.

## DISCUSSION

### I. *Selection of Legal Guardianship*

Minor asserts that the juvenile court erred when it selected legal guardianship as her permanent plan over the statutorily preferred option of adoption. (§ 366.26.) She argues the juvenile court erroneously applied the parental benefit exception. (§ 366.26, subd. (c)(1)(B)(i).) The Department, which recommend termination of parental rights and a permanent plan of adoption, submitted a respondent's brief stating it does not oppose reversal of the juvenile court's order selecting legal guardianship. Mother argues the

---

[7] According to the Department, mother and the paternal aunt did not have a good relationship due to mother's behavior toward the paternal aunt.

10

juvenile court properly applied the parental benefit exception and that its order should be affirmed.

## A. Legal Framework

At a section 366.26 hearing, the juvenile court selects a permanency plan for the dependent child. (§ 366.26, subd. (b).) At this stage of the proceedings, if the juvenile court finds by clear and convincing evidence that the child is likely to be adopted, "the court shall terminate parental rights and order the child placed for adoption." (§ 366.26, subd. (c)(1).) However, section 366.26, subdivision (c) provides certain enumerated exceptions which permit the juvenile court, " 'in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption.' " (*In re Caden C.* (2021) 11 Cal.5th 614, 631 (*Caden C.*).) The exception relevant here is the parental benefit exception. (§ 366.26, subd. (c)(1)(B)(i).) To prove this exception applies, the parent must establish "(1) regular *visitation and contact*, (2) a *relationship*, the continuance of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C.*, at p. 631.) As to the first element, the juvenile court considers whether the parent visits consistently, "taking into account 'the extent permitted by court orders.' " (*Id.* at p. 632.) As to the second element, the court assesses whether the child has a "substantial, positive, emotional attachment to the parent . . . ." (*Id.* at p. 636.) In making this determination, the proper focus is on the child, and the court may consider factors such as " '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*Id.* at p. 632.)

Regarding the third element, the juvenile court decides "whether the harm of severing the parental relationship outweighs 'the security and the

sense of belonging a new family would confer.' " (*Caden C., supra*, 11 Cal.5th at p. 633.) As explained by the Supreme Court, the juvenile court is not comparing the parent's attributes as custodial caregiver to those of the potential adoptive parents. Instead, "the question is just whether losing the relationship with the parent would harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home." (*Id.* at p. 634.)

## B. Standard of Review

*Caden C., supra*, clarified that determinations regarding the parental benefit exception are reviewed under a hybrid standard of review. (11 Cal.5th at pp. 639–640.) As to the first two elements, which are factual determinations, the reviewing court applies a substantial evidence standard of review. (*Ibid.*) The third element—whether termination of parental rights would be detrimental to the child—is reviewed for abuse of discretion. (*Id.* at pp. 640–641.) An abuse of discretion occurs only when " ' " 'the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' " (*Id.* at p. 641.) If two or more inferences can reasonably be deduced from the facts, the reviewing court may not substitute its judgment as to what is in the child's best interests. (*Ibid.*)

## C. Analysis

### 1. Consistent Visitation

The first element of the parental benefit exception is whether the parent maintained "regular visitation and contact" with the child (§ 366.26, subd. (c)(1)(B)(i)), "taking into account 'the extent [of visitation] permitted by court orders.' " (*Caden C., supra*, 11 Cal.5th at p. 632.) This is a factual finding that we review for substantial evidence. (*Caden C., supra*, 11 Cal.5th at p. 640.) Emily argues substantial evidence does not support a finding that

12

mother regularly and consistently visited her. She cites to multiple reports filed by the Department, beginning in July 2021, listing how many visits mother missed during several review periods. She also cites to a statement made by counsel for the paternal aunt at the April 10, 2023, continued section 366.26 hearing that counsel understood mother missed most of the nightly calls with Emily.

The Department's reports explain mother's struggles to maintain her sobriety and to manage her mental health issues. They also report on mother's frequent arrests and that she was incarcerated for 17 days in August and September 2021. There were periods when mother's visitation was supervised and then suspended. There were other periods when mother was given extended unsupervised visitation. Several of the Department's reports also state that mother had frequent telephone calls with minor. Throughout the nearly three-year period of this proceeding, there were missed telephone calls and missed visits.[8] However, the Department's visitation logs provide context for many of the cancelations, including illness of either mother or minor and that some of the scheduled visits fell on holidays. The visitation logs also summarize numerous, frequent visits during which mother and Emily had positive engagements.

From June to August 2020, the Department reported mother had monitored virtual and in-person visitation as well as daily telephone calls. From August 2020 to October 2020, mother's visitation continued to be consistent. Beginning in October 2020, when mother's visitation was liberalized, she initially struggled to identify a transportation plan for visits,

---

[8] Minor's reliance on the unsworn statement by counsel for the paternal aunt regarding counsel's understanding that the daily phone calls were not happening does not support reversal. (*In re Zeth* (2003) 31 Cal.4th 396, 413, fn. 11 ["unsworn statements of counsel are not evidence"].)

but the Department reported that after a couple of weeks, the issues subsided. From March 2021 to August 2021, mother's visitation was fairly inconsistent, and the Department temporarily suspended visitation in August 2021 after mother missed four consecutive visits. In September 2021, mother contacted the Department to apologize for her behavior and explain that she had been in jail for 17 days. Thereafter, mother's visitation became more consistent and included unsupervised extended visitation. Between November 16, 2022, and the section 366.26 hearing in March 2023, mother continued to visit Emily weekly and canceled only one visit. As the Department noted in its section 366.26 report, throughout the dependency proceeding, Emily maintained contact with mother. On this record, we find there is substantial evidence that mother maintained regular visitation and contact with minor.

###### 2. Benefit of Relationship

The second element of the parental benefit exception is whether the child would benefit from a continuing relationship with the parent. (§ 366.26, subd. (c)(1)(B)(i).) The juvenile court must assess whether the child has a "substantial, positive, emotional attachment to the parent . . . ." (*Caden C., supra*, 11 Cal.5th at p. 636.) The focus is on the child, and the "relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*Id.* at p. 632.) The juvenile court found legal guardianship to be in Emily's best interest based on the "obvious loving relationship between Emily and . . . her mother . . . ." Emily argues that there is no substantial evidence that she would benefit from a continuing relationship with mother. She highlights the Department's reports of mother's inappropriate behavior

14

during some visits, including mother's discussing the case with Emily, and mother's altercations with other adults while Emily was in her care. Emily also cites to the Department's reports regarding the August to September 2022 period, when Emily's school social worker reported that Emily's mental health declined when she anticipated being in mother's care or had been in mother's care, and that Emily told her school counselor that she did not feel safe with mother. However, even Emily acknowledges statements in the Department's reports that she looked forward to visits with mother, that she responded positively to mother when mother was not exhibiting concerning behavior, and that she and mother had a close and loving relationship. Emily also acknowledges that mother's therapist submitted a letter to the Department stating she had supervised a visit and observed a very close bond between mother and Emily.

The evidence in the record is mixed; however, on review, we are not to reweigh the evidence. (*Caden C., supra*, 11 Cal.5th at p. 640.) We find sufficient evidence of a beneficial relationship between Emily and mother. Emily, who was five years old when she was removed from mother's care, had consistent contact with mother throughout the nearly three years of the dependency proceeding. The record includes statements from mother's therapist that Emily had a "strong connection to her mother . . . ." At the section 366.26 hearing, mother testified that Emily was happy and excited to see her and that they had a strong bond. Mother did not believe it would be healthy for Emily if their relationship were discontinued. The juvenile court was entitled to credit this testimony. (See *In re Brandon C.* (1999) 71 Cal.App.4th 1530, 1537–1538 [affirming legal guardianship order applying parental benefit exception based on testimony from mother and grandmother of strong bond between mother and children].)

15

### 3. Detriment/Benefit Balance

The third element of the parental benefit exception requires the juvenile court to determine "whether losing the relationship with the parent would harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home." (*Caden C., supra*, 11 Cal.5th at p. 634.) When a juvenile court determines whether termination would be detrimental to a child, "the court is not comparing the parent's attributes as custodial caregiver relative to those of any potential adoptive parent." (*Caden C., supra*, 11 Cal.5th at p. 634.) Rather, the juvenile court "must . . . engage in a delicate balancing . . . that weigh[s] the harm of losing the relationship against the benefits of placement in a new, adoptive home." (*Id.* at p. 640.) We review the juvenile court's determination for abuse of discretion. (*Id.* at p. 641.) Under this highly deferential standard, we may not substitute our own judgment about what is in the child's best interests for the juvenile court's determination. (*Ibid.*)

In advance of the section 366.26 hearing, the Department social worker reported that although the relationship between mother and Emily was close, it did not outweigh the benefits of stability and permanence that adoption would provide. However, at the hearing, mother testified to the contrary. The Department social worker testified that he continued to recommend adoption as being in Emily's best interests because it was permanent. He was not asked about whether Emily would suffer detriment from losing her relationship with mother. Nor did either party offer any other testimony on this issue. Thus, the juvenile court was tasked with making its determination based on the information in the Department's reports and mother's testimony that Emily would suffer if she were to lose her relationship with mother. As discussed *ante*, there was substantial evidence

16

that the relationship between mother and Emily was positive and loving. The juvenile court acted within its discretion in balancing the detriment to Emily of losing her relationship with mother against the benefits of adoption and finding that legal guardianship with in Emily's best interests.

## II. *ICWA*

At the June 3, 2020, detention hearing, the juvenile court found that ICWA did not apply based on mother's statement to the social worker that she did not have Native American ancestry. The Department also reported that Emily's alleged father denied Native American ancestry.

Over two years later, on October 12, 2022, the Department reported that mother said she had "ancestry through the Northern Michigan by the Great Lakes tribe called Algonquian." (*Sic.*) Mother said she was not enrolled and that she had difficulty tracing her heritage. The Department reported that through its research it found a Canadian Algonquian tribe. It further reported that Emily's maternal grandmother said there might be Cherokee ancestry, but she did not know from which state and she had never been on a Cherokee roll. The Department stated that there was insufficient information to indicate that ICWA applies but that it was continuing to research the issue.

On January 26, 2023, the Department filed Judicial Council Forms, form ICWA-030 (*Notice of Child Custody Proceeding for Indian Child*), providing notice of the section 366.26 hearing scheduled for March 15, 2023. The notice was served on the Sacramento Area Director of the Bureau of Indian Affairs. It provided Emily's name, birth date, and place of birth, and the names, current addresses, and birth dates of mother, biological father, and maternal grandmother. The notice did not identify any tribes.

17

On March 15, 2023, the Department filed its section 366.26 report. The ICWA section of the report stated that although mother mentioned she might be Algonquian, there is no Algonquian tribe in the United States. The report did not mention possible Cherokee ancestry. The Department further reported that it sent notice of the hearing to the Bureau of Indian Affairs and it attached the Bureau's response, which stated that no information was provided regarding Emily's ancestry with a federally recognized Indian tribe. The Department asked the juvenile court to continue to find that ICWA does not apply.

ICWA was not mentioned during the March 15, 2023, or April 10, 2023, section 366.26 hearings. The juvenile court's order following the hearing states that it previously found, on June 3, 2020, that ICWA does not apply and that no new information has been received regarding Indian ancestry.

Emily claims the Department failed to comply with ICWA. She seeks a conditional affirmance and a remand for an ICWA hearing. Emily asserts that because she is seeking a conditional affirmance, she does not need to show prejudice. Emily's opening brief provides a general discussion of the duties of the Department and the juvenile court under ICWA and related state statutes. However, it is less clear regarding the Department and the juvenile court's alleged noncompliance. She appears to assert that the Department's notices sent to the Bureau of Indian Affairs did not provide specific information regarding potential tribal affiliations.

The Department acknowledges that the record lacks sufficient documentary evidence to support a finding that ICWA does not apply. It states it will review the case file to identify and cure any defects relating to ICWA compliance, including alleged defects identified in Emily's opening

18

brief. Mother's respondent's brief states mother takes no position regarding Emily's ICWA argument.

The juvenile court did not terminate parental rights; nor did it terminate dependency jurisdiction. The Department recognizes its continuing duties under ICWA. (*In re S.H.* (2022) 82 Cal.App.5th 166, 174 [juvenile court and county have affirmative and continuing duty to determine whether ICWA applies].) Under these circumstances, we find no reason to conditionally affirm or conditionally reverse the juvenile court's order. (*Id.* at p. 179 ["So long as proceedings are ongoing and all parties recognize the *continuing* duty of ICWA inquiry, both the Agency and the juvenile court have an adequate opportunity to fulfill those statutory duties"].)[9]

## DISPOSITION

The juvenile court's order is affirmed.

Jackson, P. J.

WE CONCUR:

Simons, J.
Burns, J.

A167608/*Humboldt County Department of Health and Human Services v. Nakia C.*

---

[9] We further note that the juvenile court's guardianship order places Emily with her paternal aunt. ICWA's first placement preference for dependent children is with a member of the child's extended family. (25 U.S.C. § 1915(a).) Accordingly, it appears that any alleged failure to comply with ICWA and related state statutes was not prejudicial. (*In re J.W.* (2022) 81 Cal.App.5th 384, 391.)