Filed 6/21/24  In re K.S. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re K.S. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E083155 |
| Plaintiff and Respondent, | (Super.Ct.Nos. J293236, J293237 & J297610) |
| v. | OPINION |
| K.C., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Lynn M. Poncin, Judge.  Affirmed.

Joseph T. Tavano, under appointment by the Court of Appeal, for Defendant and Appellant.

Tom Bunton, County Counsel, Kristina M. Robb, Deputy County Counsel for Plaintiff and Respondent.

1

Defendant and appellant K.C. (Mother) appeals the termination of her parental rights to R.S. (a boy, born Feb. 2020), K.S. (a girl, born May 2021), and A.S. (a girl, born Feb. 2023; collectively, Minors) at a Welfare and Institutions Code section 366.26[1] hearing. Mother contends the juvenile court erred by failing to properly apply the factors in *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*) in finding that the beneficial parental bond relationship exception of section 366.26, subdivision (c)(1)(B)(i), did not apply, and in terminating her parental rights.

## FACTUAL AND PROCEDURAL HISTORY

A.      INITIAL DETENTION OF K.S. AND R.S.

On May 23, 2022, plaintiff and respondent San Bernardino County Children and Family Services (Department) filed section 300 Petitions (Petitions) for K.S. and R.S. against Mother and S.S.[2] (Father; collectively, Parents), It was alleged in the Petitions pursuant to section 300, subdivision (b), that Mother had a substance abuse problem, which impeded her ability to parent K.S. and R.S. (b-1); Mother had a history of engaging in domestic violence with Father (b-2); and Mother had a history of an untreated mental health problem (b-3). There were additional section 300, subdivision (b), allegations against Father.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] S.S. is the father of K.S. and R.S.; he is not a party to the instant appeal. Facts regarding Father will be included only as they relate to Mother's parental rights being terminated.

According to the detention report, it was reported that on February 1, 2022, Mother was released from a 72-hour psychiatric hold and she continued to exhibit abnormal behavior. A welfare check was conducted by law enforcement. Mother was arrested when cocaine was found in her home that was accessible to K.S. and R.S. Mother advised law enforcement that she used cocaine in the presence of K.S. and R.S. and asked an officer to shoot her. Father was interviewed. He had been living in Florida but returned to California when paternal grandmother (PGM) contacted him advising that Mother had been arrested. He was unaware of her substance abuse. He felt that K.S. and R.S. should be placed with him and PGM. PGM agreed to help Father care for K.S. and R.S.

On February 5, 2022, Mother was interviewed and admitted to using cocaine in front of K.S. and R.S. She also admitted that she had been placed on a psychiatric hold. Mother had been diagnosed with bipolar disorder but admitted that she was not taking her medication. Mother believed her mental health crisis was triggered by Father's infidelity, losing a child, and she had been in a severe car accident. Mother reported her support system was maternal great grandmother (MGGM) and PGM. Maternal grandmother (MGM) was an alcoholic and they had a "weird relationship."

PGM reported to the Department that in February 2022, during an argument between Parents, Mother ran her vehicle into the back of Father's vehicle. Mother was arrested after both incidents. Mother admitted the incidents to a social worker. Photographs of the damage to the vehicles was provided with the detention report. PGM believed that Parents were more interested in their relationship than caring for K.S. and

3

R.S.  Mother advised a social worker on May 18, 2022, that she had met with a psychiatrist who advised her she no longer had mental health problems and did not require medication.  Mother was not attending visits with K.S. and R.S. because she did not want supervised visits.  Mother acknowledged that she could not care for K.S. and R.S. full time; it was best that they stay at PGM's home.

Mother had a criminal history involving domestic violence and drug use.  Father had an extensive criminal history.  The Department detained K.S. and R.S. and they were placed with the paternal grandparents

The detention hearing was held on May 24, 2022.  Parents were present in court. A prima facie case was established that K.S. and R.S. came within section 300, subdivision (b).  They remained detained from Parents and placed with the paternal grandparents.

      B.      JURISDICTION/DISPOSITION REPORTS AND HEARING FOR K.S. AND R.S.

A jurisdiction/disposition report was filed on June 13, 2022.  It was recommended that K.S. and R.S. remain detained from Parents, that the allegations in the Petitions be found true, and that reunification services be granted to both parents.

Mother was interviewed on June 9, 2022.  Mother admitted that the allegations in the Petitions were true.  Mother's friend provided her with cocaine and she had a bad reaction.  It caused her to have a mental health breakdown.  Mother had been using marijuana daily but had not used in two weeks in order to show her commitment to reunifying with K.S. and R.S.  She reported she had enrolled in services on her own.  She

4

was enrolled in drug and alcohol treatment and parenting classes. She was willing to accept a referral for individual therapy. Mother complained that PGM was verbally abusive to her but did express that PGM was taking good care of K.S. and R.S. and meeting their needs. Mother lived with MGGM most of her life due to MGM's alcohol use but MGM had since recovered. Mother did not work and was a stay at home mom. K.S. and R.S. had no significant health issues and there were no developmental concerns at the time.

The jurisdiction/disposition hearing was set contested. Mother stated that she had no visits with K.S. and R.S. since the detention hearing. The juvenile court ordered any past visits be made up.

The Department provided an addendum report on August 9, 2022. Mother was enrolled in a drug treatment program and was set to enroll in a domestic violence program. Mother had completed a parenting class. Mother had been referred to individual counseling. Mother had missed two drug tests claiming to not understand the color system; tested positive for marijuana; and had a negative test. Mother also participated in a psychological evaluation and the report was attached to the addendum. Mother reported that she believed she had "situational depression" caused by her relationship with Father.

PGM expressed concern with MGM supervising Mother's visits with K.S. and R.S. PGM claimed that they were " 'toxic people.' " Father had sent a harassing text to Mother about not wanting MGM to supervise visits. A visit was completed on July 1, 2022, with PGM and MGM present; there were no reports of concerns. Mother had

5

several additional visits during the reporting period. PGM was reluctant to set up the visits but eventually complied. The Department also had received police reports regarding domestic violence between Parents on January 12, 2019, and May 22, 2022.

The contested jurisdiction/disposition hearing was held on August 9, 2022. The Department submitted on its reports. Mother waived her rights and admitted the allegations in the Petitions. Father objected to the allegations against him; they were found true by the juvenile court. The allegations against Mother were found true by a preponderance of the evidence by the juvenile court. The Department requested that Mother receive eight-hour visits on Saturdays supervised by MGM. The juvenile court ordered these visits. PGM had reportedly not been accommodating Mother's visits. The disposition hearing was continued.

An addendum report was filed by the Department on September 9, 2022, prior to the disposition hearing. Mother was participating in classes but had been removed from her drug treatment program for failing to participate. She was seeking another program. She had negative drug tests but her most recent test she was a no show. During the reporting period, PGM informed the Department she could not be available to facilitate visits between K.S. and R.S. and Mother on Saturdays. K.S. and R.S. were moved to the home of MGM on August 17, 2022. PGM also informed a social worker that Parents were still seeing each other, and Mother was three months pregnant.

Several days after K.S. and R.S. were placed with MGM, MGM reported that Mother was "harassing" her and they were not getting along. Based on Mother being terminated from her drug treatment program, and her no-show drug test, the Department

6

recommended that visits be reduced for Mother to two hours one time each week. Further, visits would be supervised by the Department. A police report detailing the events when Mother crashed her vehicle into Father's vehicle, and Mother's use of cocaine were provided with the update.

The disposition hearing was held on September 9, 2022. Family reunification services were ordered for Parents. Visitation was ordered for one time each week for two hours.

C.     STATUS REVIEW REPORTS FOR K.S. AND R.S.

A status review report was submitted by the Department on February 28, 2023. The Department was recommending that K.S. and R.S. be returned to Mother's home for a 29-day trial visit and that the dependency be continued. Father would continue to receive family reunification services. K.S. and R.S. continued to reside with MGM. Mother had completed all of her services. She continued to have negative drug tests. Mother was due to give birth to her third child on February 20, 2023. Mother was leasing a three-bedroom home and had the support of MGM and MGGM. Mother had unsupervised visits with K.S. and R.S. that went well and there were no concerns. Mother reported she did not want to continue in a relationship with Father.

K.S. and R.S. had exhibited separation anxiety both from MGM when dropped off for visits and also when the visits ended with Parents. They were observed crying when MGM would walk away from them but would stop when she would pick them up. Visitation between Mother and K.S. and R.S. was positive. K.S. and R.S. had a positive bond with both Mother and Father. Mother had been granted unsupervised day visits for

7

four hours on February 1, 2023, and there were no concerns. Paternal grandparents and MGM were willing to provide a permanent home should reunification fail.

A review hearing was conducted on March 9, 2023. The juvenile court granted Mother a 30-day extended visit with K.S. and R.S. in her home.

Additional information was provided to the juvenile court on April 6, 2023. Father advised the Department on March 18, 2023, that he was moving to Florida and he no longer wanted to be involved in the dependency case. The Department had no further contact with Father. A social worker visited Mother's home. K.S. and R.S. appeared to be well taken care of and Mother was responsive to their needs. Mother was supported by paternal and maternal grandparents, and a nanny. The Department was recommending family maintenance services for Mother and that Father's reunification services be terminated.

An additional report was provided on April 10, 2023. It had been reported that a urine sample provided by Mother had a weird color and chemical scent. She was asked for an additional sample but refused. An unannounced visit was made to Mother's home. K.S. and R.S. were not present; they were with PGM. Mother was home with her newborn baby and did not appear to be under the influence. Mother had missed two random drug tests. The Department was now recommending an extension of the visit rather than family maintenance services.

On April 11, 2023, the juvenile court ordered the visit be extended. An addendum report filed on May 9, 2023, noting that a visit to Mother's home was conducted on April 26, 2023, and K.S. and R.S. appeared to be well taken care of and there no concerns.

K.S. and R.S. appeared bonded to Mother. Mother had negative drug tests. It was recommended by the Department that Mother receive family maintenance services. At a hearing held on May 12, 2023, K.S. and R.S. were returned to Mother's care with family maintenance services.

Additional information was provided to the juvenile court on June 20, 2023, and June 22, 2023. The Department was seeking a continuance of 60 days in order to evaluate a referral that originated on April 14, 2023 to be investigated. It had been reported that Father had attempted to break into Mother's home. A visit to Mother's home on June 22, 2023, revealed that K.S. and R.S. were being taken care of and that they were bonded to Mother. Mother advised the social worker that she called the police when Father attempted to break in but was fearful of filing a report. Mother advised the social worker that she believed Father was creating an army to hurt her and her children, and he was committing cyber warfare on her children. Mother admitted to feeling paranoid Mother reported that she was worried about cars driving by her home. Mother missed a drug test and a welfare check was requested by the Department. Law enforcement went to Mother's home. It was reported that Mother did not appear to be under the influence and the children were fine.

The matter was heard on June 22, 2023, for possible dismissal of the dependency case involving K.S. and R.S. The matter was continued for three weeks.

D.     SECTION 347 PETITIONS FOR K.S. AND R.S.; SECTION 300

PETITION FOR A.S.

On June 26, 2023, the Department filed section 387 supplemental petitions for K.S. and R.S.  In addition, the Department filed an original section 300 petition for A.S. against Parents.

It was alleged in the section 387 petitions, that the previous disposition of family maintenance for K.S. and R.S. was no longer effective as Mother was refusing to drug test.  She was unable to provide adequate care and supervision for K.S. and R.S. based on her mental health needs.  Further, Father's reunification services had been terminated.

It was alleged in the section 300 petition, under subdivision (b), that Mother had an untreated substance abuse problem (b-1); Mother had a history of engaging in domestic violence (b-2); and she had an untreated mental health problem (b-3).  It was additionally alleged under section 300, subdivision (j), abuse of sibling, that Mother had an open case involving K.S. and R.S.  There were additional allegations against Father.

Pursuant to the detention reports for the section 300 and 387 petitions, it was recommended that A.S. be detained from Parents.  Mother had five missed drug tests, the most recent on June 20, 2023.  On June 21, 2023, a report was made to the Department that Mother was suffering from audio hallucinations.  Mother had called a social worker and asked that her family maintenance be continued because the children were not safe due to concerns about cyber warfare from Father.

On June 22, 2023, Mother came to the Department's office with Minors.  Mother advised the social worker she did not feel safe at home.  Mother agreed to take a drug

10

test.  MGM and MGGM were with Mother and reported to a social worker that they believed Mother was suffering from a mental health crisis.  They also reported Mother had no running water in her home.  Minors appeared dirty and unkempt.  Their clothing was stained and they had dirt marks on their legs and face.  It was agreed that Mother would complete her drug test and go with Minors to MGM's home.  Law enforcement advised the Department that in the prior month, Mother had made six calls to them.  Father was found at the residence on one occasions and arrested for a traffic offense.

PGM reported to the Department that Minors were not safe with Mother.  Mother had advised PGM that June 27, 2023, was a day of sacrifice.  She said it was a "Saudi sacrifice" to which PGM responded that they were not Saudi.  Mother repeated this several times.  Father reported to the Department on June 22, 2023, that Mother had contacted him several times to care for Minors but he refused because he thought that he would get in trouble.  He met Mother in a parking lot on one occasion and she was with Minors.  She also appeared to be with a homeless man.  Father also reported that he went to her home because Mother called him claiming that she was scared.  When he arrived at the home, Mother was putting Minors in her car and was leaving for Arizona.  He stopped her from leaving.  Father believed that Mother was having a mental health crisis.

The Department recommended that Minors be removed from Mother's care based on her failure to comply with drug tests, untreated mental health, her likelihood to flee, and her failure to protect Minors from domestic violence.

11

Minors were detained from Mother on June 22, 2023. They were given clean clothes. MGM and MGGM did not want to be considered for placement. PGM was willing take Minors. Minors were placed with the paternal grandparents.

A detention hearing on the section 300 and 387 petitions was held on June 27, 2023. The juvenile court found that there was a prima facie case established for detention of Minors outside the home. Father acknowledged that A.S. was his daughter. Minors remained placed with the paternal grandparents.

The jurisdiction/disposition report for the section 387 petitions was filed on July 17, 2023. It was recommended that no reunification services be provided to Parents. The reasons for removal included that Mother was not participating in family maintenance services including failing to drug test. She also was not treating her mental health problems. Mother had been arrested on June 23, 2023, on charges of arson of an inhabited structure and grand theft. These incidents occurred at Father's home. Mother had not attended any visits with Minors since June 27, 2023. Mother advised the Department she would not attend visitation until her own father was approved to supervise visits.

Mother was interviewed by the Department. She insisted she only missed drug tests when she did not have child care. Mother admitted using marijuana after Minors were detained. Mother admitted that in the month of June, she had let her mental health "slide." Mother was on medication but would not disclose the type of medication. She insisted she was participating in an outpatient drug program but provided no documentation. MGM reported that Mother had recently been placed on a psychiatric

hold but did not provide any details. Mother insisted that Father was stalking her. The Department also received information that Mother may have been able to fake drug tests and provided forged documents from her therapist.

The jurisdiction/disposition report for the section 300 petition provided the same information. It was recommended that the allegations in the section 300 petition be found true and that Parents be denied reunification services. Mother had no visits with A.S. since June 27, 2023.

The jurisdiction/disposition hearing was continued. An addendum report to the section 300 and 387 petitions was filed on August 18, 2023. Mother had been referred to predisposition services. She had two negative drug tests. Mother had her first visit with Minors on August 12, 2023, supervised by her father. Mother had missed seven visits with Minors.

On August 18, 2023, the juvenile court bifurcated the disposition and heard only the matter as to jurisdiction. Mother objected but provided no affirmative evidence. The juvenile court found the allegations in the section 300 and 387 petitions true. Father was named the presumed father of A.S.

At the contested disposition hearing, Mother's counsel conceded that she was not entitled to services for K.S. and R.S., but requested services as to A.S. Further, Mother had not been visiting with Minors based on her not wanting PGM to supervise visits. The juvenile court reviewed the history of the case. The juvenile court denied reunification services. As for the denial of services for A.S., the juvenile court noted it appeared that

13

Mother had not benefitted from her previous services. The matter was set for a section 366.26 hearing.

Mother filed a notice of intent to file a writ petition pursuant to California Rules of Court, rule 8.450. Mother did not pursue the writ and it was dismissed by this court on October 9, 2023.

E.     SECTION 366.26 REPORT AND HEARING

In the section 366.26 report, the Department recommended that Parents' parental rights be terminated and that Minors be freed for adoption. Minors remained placed with the paternal grandparents. Minors were in good health and had no known special needs.

K S. and R.S. had been placed with the paternal grandparents from May 24, 2022, to August 17, 2022. Minors were one again placed with the paternal grandparents on June 22, 2023. Mother was visiting with Minors one time each week for two hours. PGM reported that after the visits, R.S. would be "triggered" and would say things like "I kill." She also reported that K.S. had trouble leaving visits with Mother because she was allowed to use a phone during the visits. The Department reported that Minors appeared to be "well bonded" with Mother. Mother brought snacks and toys to the visit.

Minors had a positive attachment to the paternal grandparents. Minors appeared to be very happy in the home. Paternal grandparents wanted to adopt Minors and understood the responsibility. They lived in a large home with plenty of room for Minors. Paternal grandfather owned his own business and PGM was able to care for Minors.

The matter was called for a section 366.26 hearing. Mother sought a contested hearing and also an order that Minors be made available for a bonding study. The juvenile court ordered that Minors be made available for a bonding study but was not ordering that the bonding study be conducted.

A bonding study was submitted to the juvenile court in regard to A.S. and Mother. The study was conducted by Dr. Robert E. Brodie II, a clinical and forensic psychologist. Dr. Brodie observed a visit between Mother and Minors that occurred on January 19, 2024. Dr. Brodie interviewed Mother for 45 minutes and then observed her with Minors for two hours at a mall. Mother advised Dr. Brodie that she became involved with the Department based on her and Father engaging in domestic violence. Dr. Brodie reported that during the two-hour visit, A.S. did not cry. She smiled and had the same disposition if she was held by Mother or MGF. During the visit, half of the time the family had lunch and the remainder they went to a video arcade. K.S. and R.S. embraced Mother when they arrived for the visit. Mother and MGF ordered food for the family. Mother gave Minors toys. Mother interacted with all three children. A.S. appeared content with Mother; Mother appeared attached to A.S. Dr. Brodie could not determine whether A.S. had a secure attachment to Mother based on her age. Mother showed appropriate attachment to A.S. Dr. Brodie concluded that A.S. would benefit from continued interaction with Mother. Dr. Brodie "opined" that terminating the attachment between Mother and A.S. would be detrimental to A.S. Dr. Brodie based his results on the two-hour interaction; he could change his opinion if presented with "further or contradictory information."

15

As for the observation of K.S. and Mother, K.S. appeared to Dr. Brodie to be tired. She was frustrated with R.S. about her toys. K.S. cried twice during the visit when she claimed she was hurt and upset over a toy. Mother was able to console her. K.S. was not willing to talk to Dr. Brodie. K.S., of the three children, wanted Mother's attention the most. Mother hugged and held K.S. during the visit. K.S. called her mommy. K.S. appeared comfortable, safe and attached with Mother. Dr. Brodie opined that K.S. had a secure attachment to Mother. K.S. would benefit from a continued relationship with Mother even when balanced against the benefit of a new adoptive home. Again, Dr. Brodie indicated that his opinion may change if contradictory evidence was presented to him.

Dr. Brodie also observed the interaction between Mother and R.S. R.S. was willing to speak with Dr. Brodie. He presented as an "enjoyable young boy." He stated he missed Mother and lived with PGM. Mother cared for R.S. and complemented him throughout the visit. Mother had to redirect R.S. when he was running in the mall but he responded to her direction. R.S. had a secure attachment to Mother. R.S. called her Mommy. Dr. Brodie opined that R.S. would benefit positively from continued interaction with Mother. R.S. was securely bonded and attached to Mother. It would be detrimental to R.S. to terminate their relationship.

An addendum report was submitted by the Department on January 24, 2024. They continued to recommend termination of parental rights. Parents got into an argument on December 30, 2023. During the argument, video was taken and it was sent to the social worker. Mother could be seen throwing a chair through a window at Father's house,

16

shattering the window.  Mother also could be seen taking Father's laptop.  Mother was cited and released on a charge of trespassing.

A social worker supervised a visit between Mother and Minors on January 19, 2024.  There were no concerns at the visit.  PGM reported that Minors did not cry before or after visits with Mother.  R.S. had difficulty sleeping in his bed after visits.  He would tell PGM that he was "confused in his head" and did not want to leave PGM.  The Department was concerned that the safety concerns that led to the Minors being removed from Parents had not been mitigated.

The section 366.26 hearing on the section 300 and 387 petitions was heard on January 29, 2024.  Dr. Brodie was not present and could not be examined by the Department.  The Department objected to the admission of his report since he was unavailable for cross-examination.  The juvenile court admitted the report but would consider that it was not subject to cross-examination.

Mother testified.  Mother insisted she had been visiting with Minors regularly throughout the dependency period.  Minors called her "mom" and were always excited to see her.  R.S. was very attached to her.  She believed it would be good for Minors to continue their relationship with her so they knew they had unconditional love from a parent and it would help with their development.  She missed visitations because she was having some health issues and only wanted her father to supervise visits.  Mother's counsel argued that she met the requirements of *Caden C.*  The bonding study showed that Minors were all bonded to Mother.

Minors' counsel argued that Mother's parental rights should be terminated. Minors were doing well in the home of the paternal grandparents and had no trouble transitioning back to the home after visits with Mother. The Department contended that Mother was not recently consistent in visitation. While there was a substantial positive attachment for Mother with Minors, it was not evident that Minors had a substantial attachment to Mother. R.S. had been triggered after visits with Mother and did not cry after visits. Mother was only having fun with Minors and not acting as a parent. Minors were attached to the paternal grandparents. A.S. had been with the paternal grandparents longer than she had been with Mother.

The juvenile court in its ruling relied on *Caden C.* The juvenile court noted that there were three factors. It also noted that a relationship between a parent and child was shaped by a variety of factors including the age of the child, portion of the child's life spent in parental custody, the interaction between the child and the parent, and the child's particular needs. The juvenile court first found that Minors were both generally and specifically adoptable.

In assessing the *Caden C.* factors, the juvenile court noted that A.S. was born in February 2023 and was removed from Mother on June 22, 2023. She spent most of her life outside the custody of Mother. R.S. and K.S. had been out of Mother's custody for a majority of the dependency, which began in May 2022. The juvenile court found that Mother was consistent in her visitation despite missing some visits. It also found that there was a relationship between Mother and Minors, and continuation of that relationship would benefit the children.

18

The only determination was whether severing the relationship would be detrimental to Minors.  The juvenile court reviewed the report by Dr. Brodie and again noted that Dr. Brodie was not subject to cross-examination.  It also reviewed all of the reports by the Department.  The juvenile court found, "As to the third element of *In re Caden C.*, the Court is finding the mother has not met the burden of proof that termination of parental rights would be detrimental to the children.  [R.S.] is having issues, in which he's acting out after the visits, making statements to the caregiver, quote, 'I kill,' end quote.  He also has to have some issues addressed in therapy, based on his acting out after visitation with his mother.  While the children are excitable to see the mother, it does not rise to the level where it would be detrimental to sever the parental rights."  The juvenile court noted that it was not the "exceptional" case in which it was willing to deviate from the legislative preference for adoption.

The juvenile court terminated parental rights and freed Minors for adoption.

## DISCUSSION

Mother claims she had a significant bond with Minors and the juvenile court erred by failing to apply the parental bond exception of section 366.26, subdivision (c)(1)(B)(i), choosing legal guardianship over adoption.  She insists that in making its determination, the juvenile court did not properly apply the legal standard in *Caden C.*

" 'The objective of the dependency scheme is to protect abused or neglected children and those at substantial risk thereof and to provide permanent, stable homes if those children cannot be returned home within a prescribed period of time.' [Citation.] When the child is removed from the home, the court first attempts, for a specified period

19

of time, to reunify the family.' " (*In re Celine R.* (2003) 31 Cal.4th 45, 52.) After reunification services are denied or terminated, " 'the focus shifts to the needs of the child for permanency and stability.' " (*Ibid.*) Adoption is preferred once reunification services have been terminated because it " 'gives the child the best chance at [a full] emotional commitment from a responsible caretaker.' " (*Id.* at p. 53.)

Under section 366.26, subdivision (c)(1), the juvenile court must terminate parental rights if it finds "by clear and convincing evidence" it is likely the child will be adopted. There are several statutory exceptions. Under section 366.26, subdivision (c)(1)(B)(i), one such exception exists where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." A beneficial relationship is established if it " 'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.' " (*In re Brandon C.* (1999) 71 Cal.App.4th 1530, 1534.)

Our Supreme Court in *Caden C.* clarified the proper application of the parental bond exception. (*Caden C.*, *supra*, 11 Cal.5th at p. 629.) The court provided an overview of the elements for applying the exception. "[T]he parent asserting the parental-benefit exception must show, by a preponderance of the evidence, three things. The parent must show regular visitation and contact with the child, taking into account the extent of visitation permitted. Moreover, the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship. And the parent

20

must show that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home. When the parent has met that burden, the parental-benefit exception applies such that it would not be in the best interest of the child to terminate parental rights, and the court should select a permanent plan other than adoption." (*Caden C.*, *supra*, 11 Cal.5th at pp. 636-637.)

"As to the second element, courts assess whether 'the child would benefit from continuing the relationship.' [Citation.] Again here, the focus is the child. And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or '"negative" effect of interaction between parent and child, and the child's particular needs.' [Citation.] . . . courts often consider how children feel about, interact with, look to, or talk about their parents." (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)

"Concerning the third element—whether 'termination would be detrimental to the child due to' the relationship—the court must decide whether it would be harmful to the child to sever the relationship and choose adoption. [Citations.] Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship. [Citations.] What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.)

21

The Supreme Court also held that when it weighs whether the termination of parental rights would be detrimental, "the court is not comparing the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s)." (*Caden C.*, *supra*, 11 Cal.5th at p. 634.) Further, "courts should not look to whether the parent can provide a home for the child; the question is just whether losing the relationship with the parent would harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home." (*Ibid.*) Moreover, "we reject . . . that the exception can only apply when the parent *has* made sufficient progress in addressing the problems that led to dependency. Parents need not show that they are 'actively involved in maintaining their sobriety or complying substantially with their case plan' [citation] to establish the exception." (*Id.* at p. 637, fn. omitted.)

Our Supreme Court concluded a "subtle, case-specific inquiry is what the statute asks courts to perform: does the benefit of placement in a new, adoptive home outweigh 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]' [Citation.] When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent." (*Caden C.*, *supra*, 11 Cal.5th at pp. 633-634.)

The Supreme Court also clarified the standard of review on appeal. In reviewing the finding on appeal, "a substantial evidence standard of review applies to the first two elements. The determination that the parent has visited and maintained contact with the child 'consistently,' taking into account 'the extent permitted by the court's orders'

22

[citation] is essentially a factual determination. It's likewise essentially a factual determination whether the relationship is such that the child would benefit from continuing it." (*Caden C.*, *supra*, 11 Cal.5th at pp. 639-640.)

Here, the juvenile court found both of the first two elements of *Caden C.* had been shown by Mother. The juvenile court determined that Mother had not shown the third element when it chose to terminate her parental rights. We apply a "hybrid" standard when reviewing the juvenile court's ruling on the third element of the parental-benefit exception. (*In re Eli B.* (2022) 73 Cal.App.5th 1061, 1068.) Under this standard, we review the juvenile court's factual determinations concerning the detriment analysis for substantial evidence, "but its ultimate weighing of the relative harms and benefits of terminating parental rights for an abuse of discretion." (*Ibid.*; accord, *Caden C.*, *supra*, 11 Cal.5th at p. 641 ["At its core, the hybrid standard . . . simply embodies the principle that '[t]he statutory scheme does not authorize a reviewing court to substitute its own judgment as to what is in the child's best interests for the trial court's determination in that regard' "].) A court abuses its discretion " ' " 'by making an arbitrary, capricious, or patently absurd determination.' " ' " (*Caden C.*, at p. 641.)

Initially, the juvenile court properly determined that there would not be detriment to A.S. if the parental rights of Mother were terminated. A.S. had only been with Mother for four months when she was placed with paternal grandparents. A.S. had been with parental grandparents for over six months and was bonded to them. While Dr. Brodie initially opined that A.S. was too young to determine her attachment to Mother, he nonetheless concluded that she was bonded to Mother and it would be detrimental to A.S.

23

to terminate parental rights. However, A.S. showed no signs of being upset when the visits with Mother concluded. She was equally as happy spending time with Mother as with paternal grandfather during the two-hour visit at the mall.

The juvenile court had the discretion to give whatever weight it deemed appropriate to the bonding study. "There is no requirement in statutory or case law that a court must secure a bonding study as a condition precedent" to terminating parental rights. (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1339.) The bonding study was not ordered by the juvenile court. The expert was hired by Mother and was not made available for cross-examination. The juvenile court did not abuse its discretion by concluding, having been involved in the dependency case since its inception, that the third element of *Caden C.* was not met as to A.S.

As for K.S. and R.S., R.S. had expressed distress after visits with Mother. R.S. made odd comments to PGM after visits with Mother, such as "I kill." In addition, he insisted on staying in PGM's room after visits, expressed that he did not want to leave her, and stated that he was "confused." Moreover, R.S. and K.S. showed no emotions before and after visits with Mother. Neither of them cried or expressed concerns when transitioning from visits with Mother to the paternal grandparents' home. While there is no doubt a loving relationship existed between Mother and Minors, the evidence supports the juvenile court's determination that it would not be detrimental to sever the relationship. Again, Dr Brodie expressed that it would be detrimental to both K.S. and R.S. to terminate Mother's parent rights, but the juvenile court did not have to accept this determination. It is not clear that Dr. Brodie considered the behavior of K.S. and R.S.

24

prior to and after visits as he was not available for cross-examination and did not state the evidence that he relied on, other than the two-hour observation, in reaching his decision. We cannot say that the juvenile court abused its discretion in terminating Mother's parental rights to K.S. and R.S.

Mother contends the Department and Minors' counsel improperly focused their argument on the relationship between the paternal grandparents and Minors, rather than the relationship between Mother and Minors. The juvenile court also improperly focused on the relationship between paternal grandparents and Minors, noting that the social worker observed Minors appearing to be very happy in the home and affectionate with paternal grandparents. Also, the juvenile court gave "short shrift" to the element of detriment. The juvenile court should have ordered legal guardianship.

The juvenile court did consider the stability that Minors had in the home of the paternal grandparents. However, it did not determine whether severing the parental rights of Mother would be detrimental to Minors based on that relationship. The juvenile court properly focused on the evidence supporting a bonded relationship between Mother and Minors, and whether severing the relationship would be detrimental to Minors. It spent considerable time reviewing Dr. Brodie's report and the Department's reports prior to terminating Mother's parental rights. In reaching its decision, it found that A.S. only spent a short time in the custody of Mother. Moreover, the juvenile court focused on the fact that R.S. suffered some trauma after visits with Mother, including stating "I kill," and also telling PGM that he was confused after visits. These were appropriate factors to consider in determining whether to terminate the parental relationship.

25

The juvenile court did not abuse its discretion by determining that termination of Mother's parental right would not be detrimental to Minors when balanced against the countervailing benefit of a new, adoptive home.

## DISPOSITION

The juvenile court's order terminating Mother's parental rights and freeing Minors for adoption is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER _____
                                                              J.

We concur:

RAMIREZ _____
                    P. J.

CODRINGTON _____
                    J.